IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FELICIA LOPEZ,                    §
                                  §
            Plaintiff,            §
                                  §
VS.                               §   CIVIL ACTION H-07-1534
                                  §
KIRK KEMPTHORNE, Secretary of     §
the Department of the Interior,   §
                                  §
            Defendant.            §

## OPINION AND ORDER OF PARTIAL SUMMARY JUDGMENT

Pending before the Court in the above referenced cause, brought by Plaintiff Felicia Lopez against her employer, the Department of the Interior ("DOI"), alleging discrimination based on race (Hispanic), gender (female), national origin (Puerto Rican Hispanic), and disability (Myofascial Pain Syndrome),[1] as well as

---

[1] Although the Third Amended Complaint identifies Plaintiff's disability as Myofascial Pain Syndrome, Defendant identifies Plaintiff's disability as fibromyalgia. In her deposition, Plaintiff explained that when she was first diagnosed in 1991, they called her problem something different but as it spread up and all over her body, it was identified as fibromyalgia. #43, Ex.4, 7:12-25-8:1-6.

Courts often rely on the Center for Disease Control's ("CDC's") recognition of a disease as evidence of its accepted status in the medical community. *EEOC v. Chevron Phillips Co., LP*, 570 F.3d 606, 608 n.1 (5th Cir. 2009), *citing Buxton v. Halter*, 246 F.3d 762, 763 n.1 (6th Cir. 2001). The CDC states the fibromyalgia is "[a]lso known as myofascial pain syndrome and fibromyositis," which constitute a "group of common rheumatoid disorders (not involving the joints) characterized by achy pain, tenderness, and stiffness of muscles. *See* http://www.cdc.gov/cfs/csfglossary.htm. It describes fibromyalgia as

claims of a hostile work environment and retaliation, is Plaintiff Federal Defendant's[2] motion for summary judgment (instrument #34) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(c).

Federal Defendant argues that this case should be dismissed with prejudice because Plaintiff failed to exhaust administrative remedies timely and/or cannot establish a *prima facie* case of discrimination or pretext for any of her claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, or the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213.

After reviewing the motion and related briefs, as well as the summary judgment evidence, the Court finds that the motion should be denied in part and granted in part.

---

a syndrome predominately characterized by widespread muscular pains and fatigue. The causes of fibromyalgia are unknown; however researchers hypothesize that genetics and physical and emotional stressors are possible contributory factors to the development of the illness. There are difficulties diagnosing fibromyalgia, since its clinical picture can overlap other illnesses and there are no definitive diagnostic tests. Patient education, pharmacologic agents, and other nonpharmacologic therapies are used to treat fibromyalgia. Exercise has been found to improve outcomes for people with fibromyalgia. http://www.cdc.gov/arthritis/basics/fibromyalgia.htm.

[2] Movant is the United States of America on behalf of the Federal Defendant Kirk Kempthorne, Secretary of the Department of the Interior. Under 42 U.S.C. § 2000e-16(c), in a suit by a federal employee "the head of the department, agency, or unit, as appropriate, shall be the defendant."

## Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden to demonstrate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 317, 323 (1986). If the movant succeeds, the non-movant must come forward with evidence such that a reasonable party could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must come forward with 'specific facts showing there is a genuine issue for trial.'" *Matushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A factual dispute is deemed 'genuine' if a reasonable juror could return a verdict for the nonmovant, and a fact is considered 'material' if it might affect the outcome of the litigation under the governing substantive law." *Cross v. Cummins Engine Co.*, 993 F.2d 112, 114 (5th Cir. 1993). Summary judgment is proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322-23; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). A district court may not make credibility determinations or weigh evidence when deciding a summary judgment motion. *Chevron Phillips*, 570 F.3d

606, 612 n.3 (5th Cir. 2009), *citing EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999).

Although the court draws all reasonable inferences in favor of the non-movant, the non-movant "cannot defeat summary judgment with conclusory, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Center*, 476 F.3d 337, 343 (5th Cir. 2007). Conjecture, conclusory allegations, unsubstantiated assertions and speculation are not adequate to satisfy the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994); *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002). "'[A] subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.'" *Lawrence v. Univ. of Texas Medical Branch*, 163 F.3d 309, 313 (5th Cir. 1999), *quoting Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983).

### Plaintiff's Complaint

Plaintiff's Third Amended Complaint (#31), the controlling pleading, makes the following factual allegations. Because the complaint is not very detailed and somewhat disorganized, the Court fills in some gaps and dates of events with undisputed facts from the briefing and summary judgment evidence.

Plaintiff began working for the United States Department of the Interior ("DOI"), Mineral Management Services ("MMS"), Offshore CAM, Houston, Texas, as a GSA-9 auditor in 1990. #34 at Exs. 4:5-

6; 6:632,[3] 640.  She became a GS-13 in 1999.  #34, Ex. 6:261.  She is currently a Supervisor Auditor, GS-0511013, one of two Hispanic female supervisors[4] in that office.  Up until 2000, she states that she received numerous pay increases, promotions, and increased employment responsibilities, as well as awards and recognition from her peers and superiors, and that she was never disciplined.

In 1991 Plaintiff claims that she was diagnosed with myofascial pain syndrome, a permanent disability that causes her constant pain, migraines, and other physical problems.

Plaintiff complains that she was subjected to a hostile work environment from 2000 until the present.  In 2000 Plaintiff asserts that she was subjected to "unwelcome remarks by a supervisor," Michael Casias.  Plaintiff alleges that Casias "put her down" during a meeting in front of her team members by saying, "Do you understand me, read my lips" and "Oh, are you sleeping, go to sleep."  Plaintiff contends that neither Casias nor her current supervisor,[5] Gary Grant, did anything to remedy the hostile work

---

[3] Number after the colon refers to Bates-stamped page number(s) in each exhibit.

[4] The other is Diana de la Garza.  The only testimony about her submitted as evidence is Linda Moody's Affidavit, in which she states that Plaintiff and de la Garza are not comparable because de la Garza's assignments were quite different from Plaintiff's since de la Garza was supervisor of an end-to-end processing team which is a non-audit team.  #34, Ex. 6:717-18.

[5] Defendant, with supporting evidence, delineates the changes in Plaintiff's supervisors from 1994-2000 (#34 at 2),

environment after she brought it to their attention.   Moreover, on

November 16, 2006 Grant gave her a rating of "Fully,"[6] based on a

---

From July 1994 to April 18, 2004, Plaintiff's first-in-line supervisor in MMS-CAM was Mike Casias, a Hispanic male. [Ex. 6:259, 280, 586; Ex. 1:280].  From April 18, 2004 to October 3, 2004, Plaintiff worked in RIK, her first-in-line supervisor was Stacy Leyshon [Ex. 6:261, 265; Ex. 1:280], and her second-in-line supervisor was Greg Smith [Ex. 6:263].   Upon return to MMS-CAM on October 3, 2004, Plaintiff's first-in-line-supervisors were Carol Green to September 2005, then Linda Moody to late June 2006 [Ex. 6:656, 699], then Gary Grant thereafter [Ex. 6:721].   Plaintiff's second-in-line supervisor from October 3, 2004 through November 2004 was Bobby Maxwell, and beginning in November 2004 and thereafter, Lonnie Kimball [Ex. 6:257, 622, 640-41, 653, 661].

The record additionally reflects that Moody is a Caucasian, American female with no disability; Carol Lynn Green is an African-American female with no disability; Stacy Leyshon is a Caucasian, American female with no physical disabilities; Gregory Smith is a Caucasian, American male with no physical disabilities; while Lonnie Kimball is a Caucasian American male with no physical disability.  *See, e.g.*, #43, Ex. 3 at 6, Ex. 6 at 3-5, 8-9.

[6]  The Agency Dismissal at 1-2 of Plaintiff's internal complaint (included in #34, Ex. 3) for failure to state a claim gives a detailed description of its review; it explains Plaintiff's objection to the rating and identifies when it happened more clearly:

On November 16, 2006, she was subjected to reprisal when given an unsatisfactory rating of Fully Successful from her supervisor [at that time Gary Grant].   She states this was the first time in seven (7) to ten (10) years that she was given a lower rating.   She believes the rating to be unfair and that upper management instructed her supervisor to give her the Fully Successful rating. The record shows that on November 17, 2006 the Complainant stated to the EEO Counselor that her rating had been changed to Superior, nevertheless she still wanted this incident documented. . . . The additional bases (sex, race, national origin, and disability) were added when the Complainant filed her formal complaint.

recommendation from Linda Moody, Plaintiff's former supervisor. Plaintiff notes that after the Equal Employment Opportunity Commission ("EEOC") became involved, that rating was changed to "Superior."

When Plaintiff was transferred on April 18, 2004 from MMS-CAM to Royalty in Kind ("RIK"), Plaintiff claims that without her knowledge she was "demoted" from Supervisory Auditor, a management position, to a non-supervisory technical position. She claims she was treated differently from other similarly situated persons outside her protected group, specifically Gary Grant, a Caucasian male, who was also working on RIK, but whose classification as supervisory auditor was not changed. Although she was later transferred back to MMS-CAM and her demotion was reversed, the reversal only became effective as of 10/01/04 instead of 4/18/04,

_____

The Court believes the Agency mistakenly wrote "Fully Successful," when it meant "Fully Satisfactory." *See, e.g.*, Stewart's affidavit (#35, Ex. 2 (complaining that Lonnie Kimball forced her to do work outside of her performance standards and during that period she was give a "Fully Satisfactory" performance evaluation." Regardless, the point is that the rating was lower than the Superior rating Plaintiff had previously been given.  The Agency concluded that Plaintiff's rating complaint "[fell] well below the Title VII actionable adverse action," did "not demonstrate that she is an aggrieved individual," and the fact that she "previously received a higher rating does not inevitably support an inference of discrimination or retaliation." *Id., citing Jones v. Secretary of State,* 01995660 (2002)("In the present case, given the nature of the Complainant's claims and her own statements in support thereof, and our review of the record as a whole, we find the Complainant has failed to show that she was harmed by an agency action that affected a term, condition, or privilege of employment. Additionally, the record shows the Complainant received the remedy sought, which was a Superior rating.").

the date she was transferred to RIK. Plaintiff charges that Pratima Subbarao, who told Plaintiff that the personnel action had to be approved by Lonnie Kimball, her new supervisor in MMS-CAM, also stalled or quashed efforts by Plaintiff and her RIK manager Stacy Leyshon to reverse the demotion.

Plaintiff also complains that from October 2004 through October 2005, despite excellent performance evaluations, promotions, and awards, through adverse employment decisions she was denied the opportunity to work on many projects, including supervising the Chevron residency,[7] transportation system audits, random audit (to which she was finally assigned after complaining), and a telecommuting agreement even though she lived 78 miles from work and the stress of driving round trip each day aggravated her physical condition; she claims that management also refused to grant her promotions and pay awards. In addition, she contends that her "managers [Linda Moody and Lonnie Timball] were withholding approval and signature of engagement letters, giving

---

[7] In her Response (#35 at 5-7), Plaintiff states that neither she nor similarly situated Faye Stewart, both minority women, was chosen for the Chevron residency even though both applied and both were qualified. Instead effective October 2005, the Chevron Residency was assigned by Lonnie Kimball to Bob Williamson, a Caucasian male. Without supporting evidence, she claims that the agency's explanation was pretextual because Bob Williamson's cases did not pass peer review and there was no evidence that he had previous experience working at a residency. As for Plaintiff's non-selection, Plaintiff reports that Linda Moody stated several times that Unocal had complained about Plaintiff's work at the Unocal residency, but that despite requests from Plaintiff, Moody never produced evidence of that accusation.

her uncertain workloads to create chaos, making numerous management changes, forcing Plaintiff to perform secretarial tasks, and harassing Plaintiff in an effort to prevent her from doing her job effectively." She also asserts very generally and without specific facts that she and her work "have been undermined in front of her peers and auditors, during supervisor meetings, and her decisions on training and telecommuting for direct reports are consistently being overturned."

Plaintiff alleges that Defendant refused to accommodate, indeed discriminated against, her, based on her disability and on her sex, race, and national origin. In particular Defendant refused her requests on October 3, 2004 and March 6, 2006,[8] to allow her to telecommute even though similarly situated employees were approved to do so. Although her more recent application was initially approved by her supervisor Carol Green, Plaintiff asserts that Lonnie Kimball then disapproved it without giving a reasonable explanation. Plaintiff maintains that others in similar positions and circumstances were allowed to telecommute.

Plaintiff also complains that around April 2006 Plaintiff was unable to use an entrance door next to her office and server. She further objects that her supervisor and others continued to "closely monitor" her. Until recently she was assigned an office

---

[8] During this period she states that she was under the supervision of Lonnie Kimball and Linda Moody.

at the end of the building, near the supply room, far away from her team and the other employees.  The office was too small to hold meetings with her team.  She also was not invited to nor included in supervisory meetings nor in the selection of new employees.  On an unspecified dates, she was not given an award at the time of accomplishment, but only at a later time (in one instance, two years) in violation of DOI's award recognition policy, while other managers recognized their employees at the time of accomplishment.[9] She further asserts that her attempts to become a supervisory auditor, and to have any real chance for promotions, were "thwarted."

She additionally complains that at some time after October 3, 2004, her supervisors Linda Moody and Lonnie Kimball made changes to an engagement letter that she had drafted.  Also at some point

---

[9] In her Response (#35 at 8) to the motion for summary judgment, Plaintiff explains that in February 2005 she recommended that the people under her supervision receive a spot award of $1000.00 or, if the funds were not available, two days off.  Though she made inquiries through her supervisor Carol Green, the award was not approved until December 2005.  Plaintiff said this delay was in violation of the policy set out in the DOI Human Resources Handbook, which states, "Achievements should be recognized at the time of the accomplishment," and "Awards should be presented in a way that supports the significance of the recognition."   In contrast she points out that in September of the same year, MMS Directors awarded monetary recognitions to several employees for their efforts during Hurricane Katrina.  Calling the incident an adverse employment action, Plaintiff insists that "a genuine issue of fact is raised because an ordinary person may infer from this disparate treatment that there was discrimination involved" and "Defendants never offered a satisfactory explanation as to why the request went ignored for 10 months despite multiple inquiries."

after that date she requested a larger office, specifically the one which housed the Chevron auditor residency, but her request was denied.

Plaintiff met with EEO counselor Rosa Thomas on November 16, 2005. *See* #34, Ex. 6:0300-01. Thus any charged discriminatory action must have occurred no earlier than October 2, 2005 unless limitations is equitably tolled.[10]

She filed a complaint for non-promotion effective February 27, 2005. In her Response, without providing a date, Plaintiff claims that she applied for job announcement MMSW-TL-06-MM103810, but that her application was initially denied because she purportedly did not meet the educational requirements. #35 at 9-10 and Ex. 7. That error was corrected but she maintains that "it left a stigma in the mind of those handling the application" even though Plaintiff made the "best qualified" list. #35 at 9. She alleges that Lonnie Kimball was involved in the drafting of the Vacancy Announcement for that job, that he deviated from the policy of doing panel interviews and instead was the sole interviewer for all the candidates, and that he failed to take notes during the interviews. Lonnie Kimball chose Caucasian male Gary Grant for the position and issued a written justification for his choice that

---

[10] Plaintiff filed a formal EEOC charge of discrimination on March 9, 2006, supplemented on April 5, 2006. A Final Agency Decision issued in February 2007. Plaintiff filed the instant lawsuit on May 10, 2007.

Plaintiff asserts is a mere pretext. *Id., citing* Ex. 2.1. The Justification demonstrates that Kimball hired Grant for reasons not related to job description of the position in the Vacancy Announcement. Ex. 6, 8. Faye Stewart, an African American woman similarly situated to Plaintiff, was also denied the position. Faye Stewart then brought an action through the EEOC for non-promotion; Plaintiff claims that the Administrative Law Judge found that Kimball had discriminated on the basis of race and gender. Ex. 2, 9.[11]

Plaintiff maintains that after she filed a claim with the EEO against her employer for ongoing violations, Defendant retaliated and took no steps to remedy the illegal employment practices. She has received limited work assignments and her attempts to apply for promotions have been thwarted. She claims that Gary Grant unfairly gave her the "Fully" rating in reprisal on November 16, 2006. She further vaguely accuses management of "creat[ing] circumstances which prevent others from wanting to work with her or under her direction," e.g., "by the placement of her office, the projects assigned to her teams, and the inequitable treatment of her

---

[11] The Administrative Law Judge's ("ALJ's") Bench Decision (#35, Ex. 9) reflects that Faye Stewart's complaint was based solely on race discrimination and that the Judge concluded that "Ms. Stewart's non-selection was based on intentional race discrimination." Plaintiff in the instant suit is Puerto Rican, not African American, but the ALJ's fact finding that the Agency's stated reasons for its choice were pretextual are also applicable to her claim of discrimination.

category of employees during emergency times such as hurricane Rita." She insists that "Defendant's treatment of Plaintiff was substantially different than its treatment of other [*sic*] male and non Hispanic employees in the same or similar positions and with the same or similar experience level."

**Relevant Law**

**1.  Title VII**

Under section 703(a) of Title VII, it is "an unlawful employment action for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

**a.  Employer**

Only an "employer" can be liable under the statute. Title VII defines "employer" a "a person engaged in an industry affecting commerce . . . and any agent of such a person." 42 U.S.C. § 2000e(b). Liberally construing "any agent," the Fifth Circuit has held immediate supervisors to be employers under the statute "when delegated the employer's traditional rights, such as hiring and firing" or if the supervisor "'participated in the decisionmaking process that forms the basis of the discrimination.'" *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir. 1990); *Hamilton v. Rodgers*, 791

-13-

F.2d 429, 442-43 (5th Cir. 1986), *quoting Jones v. Metro. Denver Sewage Disposal Dist.*, 537 F. Supp. 966, 970 (D. Colo. 1982).  A court should also examine whether the supervisor was responsible for the terms and conditions of the plaintiff's employment or for the plaintiff's work assignment in the company.  *Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 (5th Cir, 1994), *abrogated in part by Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)(holding that same-sex sexual discrimination is actionable under Title VII).   The purpose of the "agent" provision in § 2000e(b) was to incorporate *respondeat superior* liability into Title VII.  *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.), *cert. denied*, 513 U.S. 1015 (1994).   Nevertheless a supervisor or employee cannot be held liable in his individual capacity, only in his official capacity as an agent of the employer.  *Id. at* 652-53. Similarly, a supervisor cannot be held personally liable under the ADA, which has a mirror "employer" provision.  *See, e.g., Jenkins v. Bd. of Educ.*, 937 F. Supp. 608, 612 (S.D. Tex. 1996); *Miller v. Giglio Distrib. Co.*, 899 F. Supp. 318, 319 (E.D. Tex. 1995).

**b.  Exhaustion of Remedies for Federal Employees**

Before bringing a civil suit in federal court under Title VII, under regulations promulgated by the EEOC, federal employees[12] must

---

[12] Exhaustion of remedies under Title VII is different for a private plaintiff.  Generally in a Title VII case to have an actionable claim, a charge of discrimination must be filed by a private employee with the EEOC within 300 days after the alleged unlawful employment practice.  *EEOC v. WC&M Enterprises, Inc.*, 496

exhaust available administrative remedies. *Yee v. Baldwin-Price*, 325 Fed. Appx. 375, 378 (5th Cir. 2009), *citing Hampton v. IRS*, 913 F.2d 180, 182 (5th Cir. 1990). First, the federal employee must "initiate contact with [an EEO] Counselor [in the appropriate agency] within 45 days of the date of the matter alleged to be discriminatory. . . ." *Id., quoting* 29 C.F.R. § 1614.105(a)(1). "'Failure to notify the EEO counselor in [a] timely fashion may bar' the employee's claim." *Id., quoting Pacheco v. Rice*, 966 F.2d 904, 905 (5th Cir. 1991). *See also Pacheco v. Mineta*, 448 F.3d 783 (5th Cidr. 2006)("As a precondition to seeking . . . judicial relief [from proscribed discriminatory practices in Federal District Court] complaining employees must exhaust their administrative remedies by filing a charge of discrimination with the EEO division of their agency."). The same time limit applies to disability discrimination claims under the Rehabilitation Act by a federal employee. *Doe v. Garrett*, 903 F.2d 1455, 1459-60 (11th Cir. 1990); *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). In the federal employee context, as in the private employee context, under Title VII the purpose of the exhaustion requirements "is to provide [agencies with] an opportunity to reach a voluntary settlement of

_____

F.3d 393, 398 (5th Cir. 2007)*, citing* 42 U.S.C. § 2000e-5(e)(1). Specifically a plaintiff must file a claim with the EEOC within 180 days of the unlawful act or, if she has filed a complaint with a state or local agency, within 300 days. *Ikossi-Anastasiou v. Board of Supervisors of La. State Univ.*, 579 F.3d 546, 549 (5th Cir. 2009).

. . . employment discrimination dispute[s]" by means of an informal process before resorting to the formal EEO complaint process. *Jasch v. Potter*, 302 F.3d 1092, 1094 (9th Cir. 2002); *see also Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).

If the matter is not resolved after the mandatory counseling period and the agency's EEO makes a determination, the federal employee complainant has the choice of either appealing the decision to the EEOC Office of Review and Appeals or filing suit in federal district court. *Tolbert v. United States*, 916 F.2d 245, 248 (5thCir. 1990). If the employee chooses the former, the federal employee must file a formal written administrative complaint with the EEOC within fifteen days of the EEO counselor's notice of final interview and right to file a formal complaint ("EEO notice"). Thereafter the federal employee may proceed to federal court and file a Title VII civil action (a) within ninety days of the notice of a final agency decision on the EEOC complaint or (b) after 180 days from the filing of the EEOC complaint if the Commission has not yet issued a decision. *Tolbert*, 916 F.2d at 248; *Martinez v. Dep't of U.S. Army*, 317 F.3d 511, 513 (5th Cir. 2003); *Belgrave v. Pena*, 245 F.3d 384, 386 (2d Cir. 2001), *citing* 42 U.S.C. § 2000e-16(c), and 29 C.F.R. §§ 1614.105(a)(1), 1614.106(a) & (b), and 1614.408(a) & (b). If the complaining employee chooses to pursue her remedies with the EEOC appeal, however, she is required to wait until that administrative remedy

is exhausted, as indicated *supra*, before filing an action in federal district court; a premature filing in federal district court constitutes a failure to exhaust and requires dismissal of the claims. *Tolbert*, 916 F.2d at 249.

There are conflicting panel opinions in the Fifth Circuit as to (1) whether the exhaustion requirement is simply a prerequisite to filing suit and to be treated as a statute of limitations, thus subject to equitable doctrines of waiver, tolling and estoppel,[13] or (2) whether it is jurisdictional, the failure to perform which bars any jurisdictional review. *Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006), *cert. denied*, 549 U.S. 888 (2006); *Vidal v. Chertoff*, 293 Fed, Appx. 325, 328 n.1 (5th Cir. 2008)(recognized conflict, concluded that although the district court had the power to toll the limitations, affirmed its refusal to do so and its dismissal of a Title VII claim for the plaintiff's failure to contact the EEO officer timely about his retaliation claim); *Eberle v. Gonzales*, 240 Fed. Appx. 622, 626 (5th Cir. May 18, 2007)(relying on *Pacheco* in affirming dismissal, denying tolling, and concluding that plaintiff failed to contact EEO counselor with forty-five days to raise race and disability discrimination claims which he could have raised at the same time he raised his age

---

[13] The employee bears the burden of establishing grounds for waiver, estoppel or equitable tolling to circumvent the EEO requirement. *Eberle v. Gonzales*, 240 Fed. Appx. 622, 626 (5th Cir. May 18, 2007), *citing Teemac v. Henderson*, 298 F.3d 452, 454, 457 (5th Cir. 2002).

discrimination claims).   In *Yee*, a recent Fifth Circuit case, the
panel stated, "The exhaustion requirement is not jurisdictional,
however, and is subject to the equitable defenses of waiver,
estoppel, and equitable tolling. . . . If informal counseling is
not timely sought, 'the plaintiff has the burden of demonstrating
a factual basis to toll the period.'"   325 Fed. Appx. at 378,
*citing Pacheco*, 966 F.2d at 905, and *Blumberg v. HCA Mgmt. Co.*, 848
F.2d 642, 644 (5th Cir. 1988).   *But see Atkins v. Kempthorne*, No.
09-60401, Slip Op. at 3-4 and n.3 (5th Cir. Nov. 27, 2009)(holding
that "Congress intended for the exhaustion of administrative
remedies to be a jurisdictional prerequisite to filing a civil
action in federal court")(*per curiam*), *citing Tolbert v. United
States*, 916 F.2d 245, 249 (5th Cir. 1990)("[a]bsent an indication
of contrary congressional intent, we will not countenance
circumventing the administrative process in this manner").

Filing an administrative charge of discrimination timely with
the EEOC satisfies the exhaustion requirement.   *Id.*[14]   Although

---

[14] As explained in *Silva v. Chertoff*, 512 F. Supp. 2d 792, 812
(W.D. Tex. 2007)(footnotes omitted), about EEOC charges, applicable
to claims under Title VII as well as under the Rehabilitation Act,

"[T]he 'scope of the judicial complaint is limited [only]
to the 'scope' of the EEOC investigation which can
reasonably be expected to grow out of the charge of
discrimination."   In other words, an employee's
Rehabilitation Act claims in federal court are not
limited solely to the specific claim or claims the
employee made in his initial EEOC charge.   The employee
may also raise claims based upon any kind of
discrimination which is similar or related to the initial

courts read the EEOC charges rather broadly to determine "what EEOC investigations it can reasonably be expected to trigger," a failure to reference a claim in that charge may defeat that claim.  For example, discrimination and retaliation claims are distinct, so alleging one and not the other in an EEO charge does not exhaust a plaintiff's remedies as to the one not included.  *Bouvier v. Northrup Grumman Ship Systems, Inc.*, No. 09-30346, 2009 WL 3444765, *3 (5th Cir. Oct. 26, 2009).

The Court may, however, consider time-barred acts occurring outside the limitations period insofar as they are relevant to a Defendant's motivation.  *Reyes v. Weslaco Independent School Dist.*, No. CIV —06-372, 2007 WL 2538804, *5 (S.D. Tex. Aug. 30, 2007), citing *Morgan*, 536 U.S. at 113 (prior acts may be used as "background evidence" in support of timely employment discrimination claim), and *Jute v. Hamilton* Sunstrand Corp., 420 F.3d 166, 176-77 (2d Cir. 2005)(relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act" giving rise to Title VII claim), citing *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004)(characterizing "earlier promotion denials" as "relevant background evidence").  *See also Ramsey v. Henderson*, 286 F.3d 264,

---

EEOC charge's allegations, so long as the EEOC investigation could reasonably have been expected to encompass the additional theory of liability.

268 (5th Cir. 2002)("Discriminatory incidents outside of the filing period may be relevant background information to current discriminatory acts."), *cited and quoted in Stewart*, ___ F.3d at __, 2009 WL 33366930, at *9 (Haynes, J., concurring and dissenting)("In *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir. 1992), we held that it was proper to consider time-barred acts of harassment in assessing timely claims.").

**c. Burden of Proof in Discrimination Cases**

A plaintiff can prove a claim of discrimination under Title VII by either direct or circumstantial evidence.   *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005)(same applies to a retaliation claim under Title VII).

**(1.) Direct Evidence**

"Direct evidence proves intentional discrimination without inference or presumption when believed by the trier of fact. *Jones v. Overnite Transportation Co.*, 212 Fed. Appx. 268, 272 (5th Cir. 2006), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 195 (5th Cir. 2001), *citing Portis v. National Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir, 1994); *Overnite Transportation*, 212 Fed. Appx. at 272.  If a plaintiff produces

direct evidence of discrimination, she may "bypass the *McDonnell Douglas* burden-shifting framework [discussed *infra*] commonly applied in discrimination cases and proceed directly to the question of liability." *Moore v. U.S. Dept. of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *Stone v. Parish of East Baton Rouge*, No. 08-31008, 2009 WL 2169122, *2 (5th Cir. July 20, 2009). "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Fierros*, 274 F.3d at 192, *quoting Brown v. East Miss. Elec. Power Assoc.*, 989 F.2d 858, 861 (5th Cir. 1993).

"Workplace remarks may constitute direct evidence of discrimination if they are '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue[15]; and 4) related to the employment decision at issue.'" *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996); *Patel v. Midland Memorial Hospital & Medical Center*, 298 F.3d 333, 343-44 (5th Cir. 2002), *quoting Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222-

---

[15] Or someone in the position to influence an employment decision. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003)(*per curiam*).

-21-

23 (5th Cir. 2001).[16]  *See also Rubinstein v. Adm'rs of Tulane Educ.
Fund*, 218 F.3d 392, 401 (5th Cir. 2000), *cert. denied*, 532 U.S. 937
(2001).  If the comments fail to meet these criteria, e.g., if they
are vague and remote in time, or the speaker has no authority or
influence over the employment decisions, they are merely "stray
remarks."  *See, e.g., Krystek v. University of Southern Miss.*, 164
F.3d 251, 256 (5th Cir. 1999).  After the issuance of *Reeves*, the
Fifth Circuit has continued to find that remarks may be "probative
of discriminatory intent" and "are appropriately taken into account
when analyzing the evidence . . . even where the comment is not in
the direct context of termination and even if uttered by one other
than the formal decision maker, provided that the individual is in

---

[16] In *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133
(2000), *reversing Reeves v. Sanderson Plumbing Prods., Inc.,* 197
F.3d 688 (5th Cir. 1999), the Supreme Court declined to use this
four-prong test from *CSC Logic* employed below by the Fifth Circuit
where remarks were submitted as additional evidence of
discriminatory animus in the last stage of the *McDonnell Douglas*
framework.  Denying summary judgment, the Fifth Circuit *inter alia*
discounted these remarks because they "were not made in the direct
context of Reeves's termination."  197 F.3d at 693, *reversed*, 530
U.S. 133.  The Fifth Circuit has continued to apply this four prong
test from *CSC Logic* "when the remark is presented as direct
evidence of discrimination apart from the *McDonnell Douglas*
framework."  *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 n.4 (5th Cir.
2001), *citing Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400,
404-05 (5th Cir. 2001)(noting that the Fifth Circuit has determined
that *Reeves* did not overrule the Fifth Circuit's "stray remarks
jurisprudence, at least where the plaintiff has failed to produce
substantial evidence that each of the defendant's articulated
justifications was pretext."), *citing Rubinstein v. Adm'rs of
Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000)(applying the
stray remarks doctrine where the plaintiff has failed to establish
that each of defendant's articulated justifications was pretext),
*cert. denied*, 532 U.S. 937 (2001).

a position to influence the decision." *Palasota*, 342 F.3d at 578, *cited in Cervantez v. KMGP Services Co., Inc.*, No. 08-11196, 2009 WL 2957297, *4 & nn.22-27 (5th Cir. Sept. 16, 2009); *see also Brauninger v. Motes*, 260 Fed. Appx. 634, 640 (5th Cir. 2007)(to be evidence of animus, a remark must be related to and in proximate time to a specific employment decision and the remark must be "direct and unambiguous."). Remarks reflecting discriminatory animus may be used to demonstrate pretext or as additional evidence of discrimination. *Russell, 235 F.3d at 225.* Where the remarks are the *only* evidence of pretext, however, they are not probative. *Palasota*, 342 F.3d at 577.

**(2.) Circumstantial Evidence**

Where the plaintiff does not have direct evidence of discrimination, her claim based on circumstantial evidence is analyzed under the burden-shifting evidentiary framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

**(a.) *Prima Facie* Case**

Plaintiff must initially establish a *prima facie* case of intentional discrimination under a disparate treatment theory[17] by

---

[17] Title VII expressly prohibits both (1) intentional discrimination based on race, color, religion, sex or national origin, known as "disparate treatment," as well as (2) an employer's facially neutral practices that are discriminatory in operation against protected groups (race, color, religion, sex or national origin) and not required by the nature of the job, known

demonstrating that she "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

**(i). Adverse Employment Decision or Action**

An "adverse employment action for Title VII discrimination claims based on race, color, religion, sex, or national origin "'include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007), *quoting Green v. Administrator of Tulane Educ. Fund*, 284 F.3d 641, 657 (5th Cir. 2002). "Title VII was only designed to address '*ultimate* employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir. 1999)(emphasis in original), *quoting Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997). To be actionable, an adverse

---

as "disparate impact". 42 U.S.C. §§ 2000e-2(a)(1) and 2000e(k)(1)(A); *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006), *cert. denied*, 549 U.S. 888 (2006).

employment decision must be a "tangible employment action that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

"[A] decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII." *Banks v. East Baton Rouge Parish School Board*, 320 F.3d 570, 575 (5th Cir. 2003), *citing Burger*, 168 F.3d at 878-80 (holding that an employer's refusal of an employee's request for a "purely lateral transfer" does not qualify as an adverse employment action under Tittle VII). *See also Dollis v. Rubin*, 77 F.3d 777, 781-82 (5th Cir. 1995)(affirming decision that an employer's denial of a "desk audit" to a female employee is not an adverse personnel action under Title VII, even though the employee claimed that the decision restricted her "promotional opportunities"), *overruled in part on other grounds in retaliation cases only*, *Burlington N. and Santa Fe Ry. v. White (hereinafter "Burlington N.")*, 548 U.S. 53 (2006)(rejecting limiting actionable retaliation claims to ultimate employment decisions and redefining adverse employment action in retaliation context as any action that might have dissuaded a reasonable worker from making or supporting a charge of

discrimination).   By themselves, documented reprimands, though potentially affecting future employment decisions, do not qualify as adverse employment decisions.  *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 981 (E.D. Tex. 2004), *citing Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)(*abrogated on other grounds in retaliation cases only by Burlington N.*), and *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 470 (5th Cir. 2002).   The same is true of negative performance evaluations, even if they were not deserved.   *Thompson*, 344 F. Supp. 2d at 981 (and cases cited therein). Disciplinary write-ups also fail to qualify as adverse employment actions.  *Id.* at 982, *citing Mattern*, 104 F.3d at 707, and *Carthon v. Johnson Controls, Inc.*, 100 Fed. Appx. 993, 997 (5th Cir. 2004)(The employee's "receipt of a single disciplinary warning--without an attendant change in the terms or conditions of his employment--does not qualify as an ultimate employment decision.").  *See also Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)(employer's decision to  take away a big account from an employee after she filed an EEOC complaint did not constitute an adverse employment action even though it decreased her chances of advancement); *Davis v. Miss. Transp. Commission*, 618 F. Supp. 2d 559, 564 (S.D. Miss. 2009)("[W]e have repeatedly held that an employment action that limits an employee's future opportunities for promotion, but does not affect the employee's job duties, compensation, or benefits, does not qualify as an adverse

employment action.").

A transfer may or may not be the equivalent of a demotion and thus qualify as an adverse employment action. *Alvarado v. Texas Rangers*, 492 F.3d 605, 613-15 (5th Cir. 2007). Even if a transfer does not "'result in a decrease in pay, title, or grade, it can be a demotion if the new position proves objectively worse--such as being less prestigious or less interesting or providing less room for advancement.'" *Id.* at 613, *quoting Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999), *citing Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir, 1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992); *Serna v. City of San Antonio*, 244 F.2d 479, 483 (5th Cir. 2001); and *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000)("In a Title VII case, a transfer to a different position can be 'adverse' if it involves reduction in pay, prestige or responsibility."). "Whether the new position is worse is an objective inquiry." *Alvarado*, 492 F.3d at 613-14, *citing Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004), "'[A] plaintiff's subjective perception that a demotion has occurred is not enough.'" *Id.* at 614, *quoting Forsyth*, 91 F.3d at 774, and also *citing Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 n.8 (5th Cir. 2001)("[T]he focus is on the objective qualities of the positions, rather than an employee's subjective preference for one position over another. That subjective preference, alone, is an insufficient basis for finding

an adverse employment action."); *Serna*, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused [him] harm . . . .").

**(ii.)  Similarly Situated**

"Similarly situated" employees are employees who are treated more favorably in "nearly identical" circumstances[18]; the Fifth

---

[18] *See Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009), discussing "similarly situated" employees:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not been deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of employment discrimination analysis.  [footnotes omitted]

Circuit defines "similarly situated" narrowly.  *Silva v. Chertoff*,
512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007).[19]   Similarly

————————————————

[19] District Court Judge Montalvo in *Silva* listed the following
examples in n.33:

> *Wheeler [v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir.
> 2005)], (finding insufficiently identical circumstances
> where the terminated white plaintiff and a black manager
> who remained employed had the same supervisor, were both
> company directors, and were both accused of removing
> company assets at relatively the same time; the Court of
> Appeals noted that the white plaintiff lied repeatedly
> during the course of the company's investigation, while
> the black employee admitted her actions; in addition, the
> value of the property the black employee removed was
> "dramatically less" than the property the white plaintiff
> removed); *Mayberry [v. Vought Aircraft Co.*, 55 F.3d 1086,
> 1090 (5th Cir. 1995)](finding that the plaintiff had not
> shown "nearly identical" circumstances merely because he
> produced evidence that white and black employees in the
> same position had scrapped parts due to the employer's
> operator error or poor workmanship, but were not
> disciplined; the plaintiff had not shown that the
> undisciplined employees had, like him, a history of poor
> work performance and scrapped parts damage amounting to
> $8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97
> (5th Cir. 1991)(concluding that the plaintiff had not
> shown "nearly identical" circumstances because the
> employee outside the plaintiff's protected class who
> allegedly received more favorable treatment did not have
> the same supervisor); *Smith v. Wal-Mart Stores (no. 471)*,
> 891 F.2d 1177, 1180 (5th Cir. 1990)(determining that the
> plaintiff and the employee outside her protected class
> who allegedly received preferential treatment were not
> similarly situated where the employer discharged the
> plaintiff because the plaintiff violated its non-
> fraternization policy and the other employee's conduct
> did not involve the employer's non-fraternization
> policy).   "[P]ut another way, the conduct [or
> circumstances] at issue is not nearly identical when the
> difference between the plaintiff's conduct [or
> circumstances] and that of those alleged to be similarly
> situated accounts for the difference in treatment
> received from the employer." *Wyvill v. United Cos. Life
> Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000)(finding

situated individuals must be "nearly identical" and must fall outside the plaintiff's protective class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). Where different decision makers or supervisors are involved, their decisions are rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004), *citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) for the proposition that "[a] demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision making"). *See also Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004)("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"); *Hockman v. Westward Communications, LLC*, 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003)("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard--employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'"), *citing Okoye v. Univ. of Tex. Houston*

_____

that the "striking differences" between the plaintiff's and purportedly similarly situated employees outside the plaintiff's protected class "more than account[ed] for the different treatment they received.").

*Health Science Center*, 245 F.3d 507, 514 (5ᵗʰ Cir. 2001)(Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors; "to establish disparate treatment a plaintiff must show that the employer 'gave preferential treatment to [] [another] employee under 'nearly identical' circumstances' . . .; that is "the misconduct for which [plaintiff] was discharged was nearly identical to that engaged in by . . . [other] employee[s].'"")).

**(b.)  Burden of Production Shifts to Employer**

If Plaintiff succeeds in making a *prima facie* case, there is a presumption of discrimination, and the burden of production shifts to the employer to "'produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason'" for its adverse employment action. *Reeves*, 530 U.S. at 142, *quoting Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  There must be no credibility assessment.  *Id., citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

If the employer meets this burden, the presumptions and burdens disappear.  *Id.* at 143, *citing St. Maary's Honor Center*, 509 U.S. at 510.

**(c.)  Plaintiff's Ultimate Burden of Production and Persuasion**

Although the intermediate burden of production shifts back and forth under this framework, "[t]he ultimate burden of persuading

-31-

the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the employer succeeds in demonstrating a legitimate, nondiscriminatory reason for its conduct, Plaintiff must then show, with substantial evidence, that each of the employer's proffered justifications was mere pretext for discrimination. *Reeves*, 530 U.S. at 143; *Wallace v. The Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002). Although the presumption of discrimination has disappeared, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom in determining whether the employer's explanation is pretextual. *Reeves*, 530 U.S. at 143. Coupled with the Plaintiff's *prima facie* case, the evidence of pretext usually will constitute sufficient evidence to raise an issue of material fact as to whether the employer's reason is credible or merely a pretext for discrimination or, if its reason is true, that a discriminatory reason more likely motivated the decision to effect its adverse employment action. *Reeves*, 530 U.S. at 143, 147-49.[20] Sometimes, however, additional evidence may be

---

[20] In *Reeves*, the Supreme Court found that the Fifth Circuit panel "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.

required.  *Id.*  "[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.'  In other words, '[i]t is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* at 146-47 (emphasis in original), *citing St. Mary's Honor Center*, 509 U.S. at 511, 524, 519.  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Id.* at 148-49.

**d.  Hostile Work Environment**

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Stewart v. Miss. Transp. Commission*, ___ F.3d ___, No. 08-60747, 2009 WL 3366930, *4 (5th Cir. Oct. 21, 2009), *citing*

-33-

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

To prevail on a claim of a hostile work environment under Title VII, an employee initially must make a *prima facie* case of the following elements:  (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome harassment; (3) that harassment was based on her membership in the protected class; (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007)(national origin and religion harassment); *Johnson v. TCB Const. Co., Inc.*, 334 Fed. Appx. 666, 670-71 (5th Cir. 2009)(racially hostile work environment); *Stewart v. Miss. Transp. Commission*, ___ F.3d at ___, 2009 WL 3366930 at *6 (sexual harassment), *citing Lauderdale v. Texas Department of Criminal Justice, Institutional Division*, 512 F.3d 157, 163 (5th Cir. 2007).  "Hostile work environment claims based on racial harassment are viewed under the same standard as those based on sexual harassment." *Morgan*, 536 U.S. at 116, n.10, *citing Faragher v. Boca Raton*, 524 U.S. 775, 786-87 and n.1 (1998), and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).  If the harasser is a supervisor with authority over the employee, only the first four elements need be shown. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).  To "affect[] a term, condition, or

privilege of employment," the harassing conduct "'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Aryain v. Wal-Mart Stores of Texas, LP*, 534 F.3d 473, 479 (5th Cir. 2008), *quoting Lauderdale*, 512 F.3d at 163.  The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Id., quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  "'Whether an environment is hostile or abusive depends on a totality of circumstances, [including] frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance.'" *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655-56 (5th Cir. 2005)(citation omitted); *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005).  *See also Hockman v. Westward Communications, LLC*, 407 F.3d 317, 326 (5th Cir. 2004)(adding as element 5, "whether the complained-of conduct undermines the plaintiff's workplace competence.").  Indeed, "the harassment must be so 'severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place.'" *Hockman*, 407 F.3d at 326, *quoting Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  The complained-of conduct must

be "more than rude or offensive comments, teasing or isolated incidents." *Id.* The Supreme Court has repeatedly opined that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* at 328*, citing inter alia Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). For allegations of a sexually hostile work place, "'implicit or explicit in the sexual content [of the harassment] [must be] the message that the plaintiff is incompetent because of her sex.'" *Id.* at 326*, citing Butler v. Yselta Indep. School Dist.*, 161 F.3d 263, 270 (5th Cir. 1998).

If a plaintiff makes a *prima facie* case of a hostile work environment, the employer can raise an affirmative defense to liability by demonstrating (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior*;* and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm or otherwise. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 775, 765 (1998); *Faragher*, 524 U.S. at 807.

The "continuing violation" theory has been applied by the Fifth Circuit to Title VII claims of a hostile work environment, which is usually comprised of a series of separate acts that collectively constitute one unlawful employment practice. *Stewart,*

-36-

2009 WL 3366930, at *4. In contrast to a case alleging discrete violations, the hostile work environment doctrine "extends the limitations period on otherwise barred claims only when the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004). "Although there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. [She] must show an organized scheme leading to and including a present violation." *Huckaby v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998). "[I]t is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Id*. Under a continuing violation exception, "a plaintiff must prove that 'a persisting and continuing system of discriminatory practices' produces 'effects that may not manifest themselves as individually discriminatory except in cumulation over a period of time,' and that one of the acts falls within the limitations period." *Merriman v. Potter*, 251 Fed. Appx. 960, 964–65 (5th Cir. 2007)(citations omitted). *See also Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir. 1986)(recognizing an exception to the limitations period "[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts."). If the Plaintiff satisfies the requirement for demonstrating a continuing violation, the court may

then consider all acts alleged to have contributed to the hostile work environment, even if they occurred outside" the limitations period. *Ramsey*, 286 F.3d at 269.[21]; *in accord*. *Stewart,* ___ *F.3d at ___,* 2009 WL 3366930, at *4*, *citing Morgan,* 536 U.S. at 105.

The continuing violation doctrine is not applicable to discrete acts of discrimination that occur outside of the statutory time period, however. *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 1997); *Holden v. Illinois Tool Works, Inc.*, No. H-06-2981, 2008 WL 183334, *2 (S.D. Tex. Jan. 18, 2008). As the Supreme Court noted in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112-13 (2002),

> "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.' . . . [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period [or 45 day period for consulting an EEO officer for federal employees] after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim." [citations omitted].

---

[21] Title 42 U.S.C. § 2000e-2 identifies the kinds of actions that qualify as "[u]nlawful employment practices, and includes a number of discrete acts such as refusal to hire, discharge, etc. *Morgan*, 536 U.S. at 111.

Nevertheless, even with a continuing violation, the statutory time begins to run when "facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated." *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1560-61 (5th Cir. 1984).   Thus, given the "[e]quitable considerations at the core of the continuing violation theory, the focus is on what incidents or events, in fairness and logic, should have placed the average lay person on notice that her rights have been violated.   *Id*.   "The mere perpetuation of the *effects* of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period." *Glass*, 757 F.2d at 1561, *quoting Trevino v. Celanese Corp.*, 701 F.2d 397, 403 n.7 (5th Cir. 10983)(emphasis in the original).   *Id*.

Thus there are three restrictions on the continuing violation doctrine:   plaintiff must show that (1) the different acts are related[22]; (2) the violation must be continuing, and an intervening action by the employer[23] will sever the prior actions from those

---

[22] For example, the pre- and post-limitations period incidents may involve the same type of harassment, perpetrated by the same management, with the same frequency to constitute a single practice for purposes of 42 U.S.C. § 2000e-5(e)(1).   *Stewart v. Miss. Transp. Commission*, ___ F.3d ___, 2009 WL 3366930, at *5.

[23] "'When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability.'" *Stewart*, ___ F.3d at ____, 2009 WL 3366930, at *5, *quoting Hockman v. Westward Communications, LLC*, 407 F.3d 317, 329 (5th Cir. 2004), *quoting in*

that came after it and bar liability for prior acts outside the filing window; and (3) the court may use its equitable powers to temper the continuing violation doctrine to "honor Title VII's remedial purpose 'without negating the particular purpose of the filing requirement.'" *Stewart, ___ F.3d at ___,* 2009 WL 3366930, at *4*, citing Morgan,* 536 U.S. at 120, *quoting Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982).  With respect to the first prong, relatedness, various acts may be sufficiently "related" to earlier ones to constitute a single "practice" for purposes of 42 U.S.C. § 2000e-5(e)(1) if the incidents "involved the same type of harassment and were perpetrated by the same manager." *Stewart*, ___ F.3d at ___, 2009 WL 3366930, at *5, *citing Burlington N.*, 536 U.S. at 120.  With respect to the third prong, the Supreme Court has held that equitable doctrines such as waiver, estoppel and equitable tolling "are to be applied sparingly." *Id.* at 113, *citing Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982), and *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984).  In *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1027 (7th Cir. 2003), the Seventh Circuit observed, "*Morgan* foreclosed the use of the continuing violation doctrine to incorporate untimely claims for discrete discriminatory actions even though they may be related to a timely claim."

---

turn *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993).  "'Prompt remedial action' must be 'reasonably calculated' to end the harassment.'"  *Id.*

**e.  Retaliation or Reprisal**

To assert a claim of retaliation under Title VII,[24] a plaintiff with only circumstantial evidence must satisfy the burden-shifting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  First the plaintiff must make a *prima facie* case that meets three elements:  (1) the employee engaged in an activity that is protected by Title VII; (2) the employer took an adverse employment action against the employee; and (3) there is a causal connection between the protected activity and the adverse employment action. *Brazoria County, Tex. v. EEOC*, 391 F.3d 685, 692 (5th Cir. 2004), *cited for that proposition in Cooper v. Dallas Police Assoc.*, 278 Fed. Appx. 318, 320 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 1912 (2009).  *See also McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

The statute defines "protected activity" as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII.  42 U.S.C. § 2000e-3(a). "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the

---

[24]  Plaintiff's complaint erroneously states that her retaliation claim is under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), which addresses unpaid overtime, not discrimination based on race, national origin, gender and disability.  Plaintiff's discrimination and retaliation claims should be brought under the appropriate provisions of Title VII and the Rehabilitation Act.

employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003). The anti-retaliation provision of Title VII does not protect an employee from all retaliation, but only from retaliation that produces an injury or harm. *Burlington Northern*, 548 U.S. at 67.

An "adverse employment action," for the second prong, in a retaliation claim only, is not limited to the Fifth Circuit's previous "ultimate employment decision" standard for discrimination claims under the statute. The Supreme Court has held that "the standard for retaliation is broader than for discrimination" in that such actions are not limited to tangible employment actions. For purposes of a retaliation claim, an adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006).[25] *See also McCoy v. City of Shreveport*, 492 F.3d 551, 559

---

[25] As the Fifth Circuit explained in *Bouvier*, 2009 WL 3444765, at *3 n.2,

> The Supreme Court has held that Title VII's anti-retaliation provisions prohibit more conduct than its anti-discrimination provisions. *See Burlington Northern*[, 548 U.S. 53]. Expressly limiting its holding to retaliation claims, the Supreme Court abrogated the "ultimate employment [decision] test" and held that employees must show that a reasonable employee would have found the challenged action materially adverse. *Id.* at 67. However, in the Fifth Circuit the "ultimate employment test" still applies to cases alleging

(5th Cir. 2007)(same)(*quoting Burlington N.*, 548 U.S. at 68).  "The purpose of this objective standard is 'to separate significant from trivial harms' and 'filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Stewart*, ___ F.3d at ___, 2009 WL 3366930, at *7, *citing Burlington N*, 548 U.S. at 68.

The Fifth Circuit has held that temporal proximity between the protected activity and the alleged adverse employment action, by itself, is insufficient to create a genuine issue of material fact for the element of causation. *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 443 (5th Cir. 2007)(collecting cases on temporal proximity). *See also Mayberry v. Vought Aircraft Co.*, 55 F.3d at 1092 (Close timing may be a significant factor, but not necessarily determinative of the relation between the protected activity and the adverse action.); *McCoy*, 492 F.3d 562 (although temporal proximity between the protected activity and an adverse employment action may be enough of a "causal connection" to establish a *prima facie* case, "once an employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must

discrimination. *See McCoy [v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007)] ("In *Burlington Northern*, the Court expressly limited its holding to Title VII *retaliation* claims . . . ."(emphasis in the original).

offer some evidence from which the jury may infer that retaliation was the real motive.").

"'Petty slights, minor annoyances, and simple lack of good manners'" are not actionable retaliatory conduct that would dissuade a reasonable employee from making a charge of discrimination. *Stewart*, ___ F.3d at ___, 2009 WL 3366930, at *7, *citing Burlington Northern*, 548 U.S. at 68. "'The significance of any particular act of retaliation will often depend upon the particular circumstances. Context matters.'" *Id.* at *8, *citing Burlington N.*, 548 U.S. at 69. If the context shows no adverse impact as a result and no blame can be attributed to the employee that "might carry a stigma in the workplace," an employment action is not an adverse action. *Id.* "'[A] lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances,'" which should be judged from the viewpoint of a reasonable person in the plaintiff's position, considering all the circumstances: did the reassignment affect the employee's job title, grade, duties hours, salary, or benefits or cause a diminution or increase in prestige or standing among her co-workers? *Id., citing Aryain*, 534 F.3d at 485.

If the plaintiff succeeds in making a *prima facie* case of retaliation, a presumption of discrimination arises, and the burden shifts to the defendant employer, to provide a legitimate, nonretaliatory reason for the adverse employment action. *Hockman*

*v. Westward Communications LLC*, 407 F.3d 317, 330 (5th Cir. 2004), *cited for that proposition in Cooper*, 278 Fed. Appx. at 320.  If the employer succeeds, under the *McDonnell Douglas* framework the presumption of discrimination falls away and the plaintiff must show that the employer's articulated reason for its action is merely a pretext for retaliation, or if true, is only one reason for its conduct and another motivating factor is plaintiff's protected characteristic.  *Cooper*, 278 Fed. Appx. at 320, *citing McDonnell Douglas*, 411 U.S. at 804; *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007).[26]   The plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.  *McCoy*, 492 F.3d at 557.  The plaintiff can show pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003), *quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 143.  For example, Plaintiff could show that she is clearly better qualified than the person who got the job, promotion, raise, etc.,[27] or that the

_____

[26] This "modified *McDonnell Douglas*" standard, replacing the previously used "sole causation" standard, is also applied to ADA and Rehabilitation cases.  *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

[27] "However, the bar is set high for this kind of evidence because differences in qualification are generally not probative evidence of discrimination unless those disparities are 'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Celestine*, 266 F.3d

employer's articulated reason is false by showing inconsistency in the employer's explanations at different times. *Burrell*, 482 F.3d at 412, *citing Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001), and *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002)("a factfinder may infer the ultimate fact of retaliation by the falsity of the explanation").  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and thereby preclude summary judgment. *Reeves*,

## 2.  The ADA

The ADA specifically exempts the federal government as an employer from its coverage.  42 U.S.C. § 12111(5)(B)(i)("The term 'employer' does not include the United States [or] a corporation wholly owned by the government of the United States . . . .").  *Washburn v. Harvey*, 504 F.3d 505,508 (5th Cir. 2007), *citing Florida East Coast Ry. Co. v. United States*, 519 F.2d 1184, 1187 (5th Cir. 1987).  *See also Henrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003 (The ADA, 42 U.S.C. § 12111(5)(B), does not apply to the Federal government), *cert. denied*, 540 U.S. 1018 (2003).  Instead, the Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Dark*

_____

at 357, *quoting Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999).

*v. Potter*, 293 Fed. Appx. 254, 258 (5th Cir. 2008), *citing Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

Title VII is the exclusive remedy for federal employment discrimination claims of the kind that it expressly covers (those based on race, color, religion, sex, or national origin, and in retaliation for a protected activity).[28]  *Brown v. GSA*, 425 U.S. 820, 832, 834-35 (1976); *Davis v. Passman*, 442 U.S. 228, 254 (1979).[29]  Title VII prohibits discrimination against federal

---

[28] *See, e.g., Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573-74 (5th Cir. 1989)(Title VII is the exclusive remedy for violation of its own terms, but a separate, independent claim of a violation of different constitutional or statutory rights, not within the reach of and cannot be remedied by Title VII, may be pursued concurrently), *cert. denied*, 493 U.S. 1019 (1990).

[29] As explained by the Fourth Circuit in *Pueschel v. United States*, 369 F.3d 345, 352-53 (4th Cir. 2004):

As originally enacted in 1964, however, Title VII did not apply to federal employees.  Instead, employment discrimination claims brought by federal employees were governed by Executive Orders and agency regulations.  In general, a federal agency accused of discrimination would investigate the claim, conduct a hearing and render a final decision, which could only be appealed to the Board of Appeals and Review of the Civil Service Commission ("CSC").  *Brown v. GSA*, 415 U.S. 820, 825 . . . (1976). Consequently, employment discrimination claims brought by federal employees were adjudicated by the agency accused of the wrongdoing and could not be appealed in federal court.

Believing that such a system failed to provide federal employees sufficient protection against employment discrimination, Congress amended Title VII by passing the Equal Employment Opportunity Act of 1972 ("EEOA").  *See* 42 U.S.C. § 2000e-16.  The EEOA expressly subjects federal agencies to Title VII's prohibitions, delegates to the EEOC the authority to ensure that

employees:  "All personnel action affecting [federal] employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  Title VII applies to retaliation claims brought by federal employees, which are also governed by the shifting burden framework of *McDonnell Douglas.  See, e.g., Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985); *Brown v. Brody*, 199 F.3d 446.

### 3.  The Rehabilitation Act

For a disability claim seeking monetary relief brought by a federal employee, Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, is the exclusive avenue.  *Calero-Cerezo*

---

federal agencies comply with Title VII and allows aggrieved federal employees to commence civil actions in federal court for review of their discrimination claims. *Id.*  In providing aggrieved federal employees a private right of action in federal court, however, the EEOA requires that federal employees exhaust their administrative remedies prior to commencing such an action.  *Id.* § 2000e-16(c); *Brown v. GSA*, 425 U.S. at 832 . . . .; *see also Loeffler v. Frank*, 486 U.S. 549, 559 . . . (1988)("[The EEOA] permits an aggrieved employee to file a civil action in federal court provided the employee has met certain requirements regarding exhaustion of administrative remedies.").  Consequently the EEOA "establis[es] complementary administrative and judicial enforcement mechanisms designed to eradicate federal employment discrimination." *Brown v. GSA*, 425 U.S. at 831 . . . .  As a result of this complementary enforcement scheme and the EEOA's legislative history, the Supreme Court concluded in *Brown v. General Services Administration* that Congress intended for Title VII to be the exclusive preemptive and judicial scheme for the redress of federal employment discrimination," *id.* at 829 . . ., and thus held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment."  *Id.* at 835 . . . .

*v. United States Dep't of Justice*, 355 F.3d 6, 12 n.1 (1st Cir. 2004); *Pinkerton v. Spellings*, 529 F.3d 513, 517 (5th Cir. 2008). *See* 29 U.S.C. § 794(d)("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance . . . or activity conducted by the United States Postal Service.").

Pursuant to Section 501(g), 29 U.S.C. § 791(g),[30] the standards for determining a violation of the Rehabilitation Act, as amended in 1992, are the same as those for a violation of the ADA. *See* 42 U.S.C. § 794(d) and 42 U.S.C. §12101, *et seq.; Pinkerton v. Spellings*, 529 F.3d 513, 516-17 (5th Cir. 2008), *citing Lane v. Pena*, 518 U.S. 187, 193-94 (1996)(Congress waived the government's sovereign immunity from monetary claims brought under § 501, while immunity is not waived for § 504, so while federal employees may sue under both statutes, they can recover monetary relief only under § 501). Thus the Court will review the factual allegations in Plaintiff's complaint and the summary judgment submissions to determine whether her claim, if properly brought under the Rehabilitation Act, would survive.

Section 12112(a) of the ADA provides that no covered entity

---

[30] Section 791(g) provides, "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act . . . ."

shall "discriminate" against a "qualified individual with a disability" because of the disability of such an individual in regard to, *inter alia*, "the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  In addition, Section 12112(b)(5) states that the term, "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . .   unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity."

Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of a Rehabilitation Act violation by establishing that (1) she has a "disability"; (2) she is "qualified" for her position; (3) she suffered an adverse employment action because of her disability or the perception of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees.  *Chevron Phillips*, 570 F.3d at 615.   "[W]here the disability, resulting limitations, and necessary reasonable accommodation are not open, obvious and apparent to the employer, the initial burden rests primarily upon the employee to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."  *Id.* at 621, *citing Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th

Cir. 1996).

The burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Chevron Phillips*, 570 F.3d at 615. If the employer meets this burden, the framework falls away and the issue becomes discrimination *vel non*. *Id.* The plaintiff must then offer sufficient evidence to raise a genuine issue of material fact as to whether that articulated reason is a mere pretext for discrimination, or one reason and a motivating factor for the decision. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). To determine whether the plaintiff is "otherwise qualified" for the job, the court must first decide whether the plaintiff can perform the core functions of the job; if not, the court must determine whether a reasonable accommodation would enable the employee to do so. *Chandler* v. City of Dallas, 2 F.3d 1385, 1393 (5th Cir. 1983), *cert. denied*, 511 U.S. 1011 (1994). A covered employer must provide reasonable accommodations to an "otherwise qualified" person with a disability unless the employer

can show that the accommodation "would impose an undue hardship" on the employer.  42 U.S.C. § 12112(b)(5)(A).  The plaintiff bears the burden of requesting reasonable accommodations.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

A disability is "(A) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[31]  To state a claim under subsection A, a plaintiff must allege that she has a physical or mental impairment.  § 12102(2)(A); 29 C.F.R. § 1630.2(g).  A "physical impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine."  29 C.F.R. § 1630.2(h)(1).

---

[31] Courts look to two possible authorities for interpreting the terms of § 12101:  the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 706(8)(B)(1988), and the EEOC regulations construing the ADA.  *EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 614 n.4 (5th Cir. 2009), *citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002).  The Rehabilitation Act, which prohibits discrimination based on disability by recipients of federal funds, is a precursor to the ADA on which Congress relied in drafting the ADA and about which Congress specified, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under Title V of The Rehabilitation Act of 1973 (29 U.S.C. §§ 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title."  *Chevron Phillips*, 570 F.3d at 614 n.5.

Simply having an impairment is insufficient to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity. *Chevron Phillips,* 570 F.3d at 614, *citing Toyota Motor*, 534 U.S. at 195. Moreover a plaintiff must have more than a diagnosis of an impairment to prove she has a disability under the statute; those "claiming the act's protection" must "prove a disability by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). *See also Toyota Motor*, 534 U.S. at 198 ("an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's lives. The impairment impact must also be permanent or long term.").[32] An "impairment"

---

[32] In September 2008, Congress enacted the Americans with Disabilities Act Amendment of 2008, effective as of January 1, 2009. Pub. L. 110-325, 122 Stat. 3553, 3554 (2008), "to restore the intent and protections of the Americans with Disabilities Act of 1990," narrowed by the Supreme Court. It expanded the class of individuals to be protected under the definition of "disability." It also overturned *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999)(holding that under subpart (A), to limit the major life activity of working a plaintiff had to show that she was regarded as having an impairment that substantially limited her life activity of working in the same "broad class of jobs"), and *Toyota Motor*'s narrow, exacting definition of "substantially limits," i.e., "considerable" or "to a large degree" so as to "preclude impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." 534 U.S. at 196-97. Section 3(3)(B) of the 2008 Amendments states that it "shall not apply to impairments that are transitory and minor," i.e., an "impairment with an actual or expected duration of 6 months or less." Section 3(D) further states, "An impairment that

does not include "'transitory illnesses which have no permanent effect on the person's health.'" *de la Torres v. Bolger*, 781 F.2d 1134, 1137 (5th Cir. 1986), *citing Stevens v. Stubbs*, 576 F. Supp. 1409, 1414 (N.D. Ga. 1983). *See also Evans v. City of Dallas*, 861 F.2d 846, 852 (5th Cir. 1988)(the Act "contemplates an impairment of a continuing nature."); *Van Zande v. Wisconsin Dep't. of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995)(Intermittent, episodic impairments are not disabilities), *citing* 29 C.F.R. pt. 1630app., § 1620.2j ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and

---

is episodic or in remission is a disability if it would substantially limit a major activity when active."
     Plaintiff filed her complaint on May 10, 2007, and the Amendment expressly did not go into effect until January 2009. Those courts that have addressed and answered the question of the retroactive application of the Act have concluded it does not apply retroactively. *See, e.g.,* appellate court decisions in *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n. 8 (5th Cir. 2009)(ADA Amendments Act of 2008's "changes do not apply retroactively"), *citing Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)("Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear."); *Lytes v. DC Water and Sewer Authority*, 572 F.3d 936, 939-40 (D.C. Cir. 2009)("By delaying the effective date of the ADAA, the Congress clearly indicated the statute would apply only from January 1, 2009."); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009)(The ADA Amendments Act of 2008 "does not apply to govern conduct occurring before the Act became effective"; *Thornton v. UPS, Inc.*, ___ F.3d ___, No. 08-2162, 2009 WL 3766264, *6 n.3 (1st Cir. Nov. 12, 2009)(*citing Milholland*).

influenza.").

The implementing regulations in § 1630.2(i) provide a non-exhaustive list of major life activities, which include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and walking." 29 C.F.R. § 1630.2(i); *id.* Moreover, "to be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it." *Id.*, *citing* 29 C.F.R. § 1630.2(j). In deciding whether a person is "substantially limited" in a major life activity, the EEOC advises that courts should consider: '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Id.* at 614-15, *citing* 29 C.F.R. § 1630.2(j). "[W]hether an individual is disabled under the ADA . . . remains an individualized inquiry." *Chevron Phillips*, 570 F.3d at 620.

A claim of unlawful retaliation under the ADA and the Rehabilitation Act, as under Title VII, requires a plaintiff to make a *prima facie* case by showing that (1) he or she engaged in an activity protected by the ADA, (2) he or she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *Seaman v. CSPH*, 179 F.3d

297, 301 (5th Cir. 1999), *cited for that proposition in Tabatchnik v. Continental Airlines*, 262 Fed. Appx. 674, 676 (5th Cir. Jan. 30, 2008).  As noted earlier, in *Burlington N.*, 548 U.S. at 60, the Supreme Court, concluding that the range of employer actions prohibited by Title VII's anti-retaliation provisions is broader than that covered by its anti-discrimination provisions, held that for retaliation claims, instead of the "ultimate employment decision" standard, an employee suffers an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  If the plaintiff succeeds, the employer must present a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  If the employer succeeds, the plaintiff must present sufficient evidence showing that the employer's proffered reason is a pretext for discrimination and show that but for the protected activity, the adverse action would not have occurred.  *Id.*[33]   Unlike under Title VII, for a

_____

[33] The Plaintiff's burden of showing a causal link for a *prima facie* case of retaliation is much less stringent than  the "but for" causation that a jury must find.  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).  "[T]iming can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected act and the adverse employment action is 'suspicious[ly]'proximate."  *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 418 n.9 (5th Cir. 2003).  The Fifth Circuit has explained,

In *Clark County School District v. Breeden*, the Supreme

retaliation claim under the ADA there is no requirement that the plaintiff suffer from an actual disability; the plaintiff need only demonstrate that the plaintiff has a reasonable good faith belief that the statute has been violated. *Tabatchnik*, 262 Fed. Appx. at 676 & n.1 (failure to prove a disability does not preclude the plaintiff from pursing a retaliation claim).  Where an employee has a good faith belief that he is disabled or perceived as disabled, making a request for a reasonable accommodation under the ADA may constitute engaging in  a protected activity.  *Id., citing* 42 U.S.C. § 12112(b)(5)(A) (statute requires "making reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.").

---

> Court noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality *to establish a prima facie case* uniformly hold that the temporal proximity must be 'very close.'" 532 U.S. 268, 273 . . . (2001)(emphasis added). *Breeden* makes clear that (1) to be persuasive evidence, temporal proximate must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation. *See id.* But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation.  Such a rule would unnecessarily tie the hands of employers.

*Strong v. Univ. Healthcare Sys., LLC.* 482 F.3d 802, 808 (5th Cir. 2007).

**Defendant's Motion for Summary Judgment (#34)**

Defendant lists and numbers the events that Plaintiff claims demonstrate that she was discriminated against based on her race, sex, national origin, disability, hostile work environment and reprisal and cites to relevant summary judgment evidence.

1.   Beginning in 2000 Plaintiff was subjected to a hostile work environment by supervisors.  Exs. 1:279-92 and 2:293-98.

2.   In October 2004 and March 6, 2006 supervisors disapproved Plaintiff's telecommuting requests.  Exs. 2:269-71 and 6:719.

3.   From October 2004 to October 2005, Plaintiff did not receive work assignments from her supervisors that conformed to her position's description and on an unspecified date, her request to supervise the Chevron residency was denied.  Exs. 6:741 and 2:294.  She was "eventually assigned a random audit position."  Ex. 2:295.

4.   On April 18, 2004, when Plaintiff was transferred to RIK from MMS-CAM, Plaintiff's job classification was changed from GS-13 supervisory auditor to GS-13 Revenue Specialist.  Ex. 6:294.

5.   Around April 5, 2006, Plaintiff could not enter a door next to her office.  Ex. 2:295.

6.   Around April 5, 2006, Plaintiff alleges that her supervisor closely monitored her.  Ex. 2:295.

7.   On an unidentified date Plaintiff was not given an award at the time of accomplishment; instead she was given the award at a later date, allegedly in violation of DOI policy.  Exs. 2:294 and 6:664.

8.  On an unidentified date, Plaintiff's efforts to apply for a supervisory auditor position were thwarted.  Ex. 2:295.

9.  In 2000 Plaintiff was subject to unwelcome remarks by a supervisor.  Ex. 2:294.

10.    Sometime  after  October  3,  2004,  Plaintiff's
supervisors  allegedly  made  changes  to  an  engagement
letter that she drafted.  Ex. 2:294.

11.   Sometime after October 3, 2004, Plaintiff thought
her office was too small, but she was denied the larger
office which housed the Chevron residency auditor.  Ex.
2:295.

## 1.    Failure to Exhaust Administrative Remedies

First,  supported  by  summary  judgment  evidence,  Defendant
argues  that  Plaintiff  failed  to  exhaust  administrative  remedies
timely.   As noted, a federal employee who believes she has been
discriminated against must contact an EEO officer within forty-five
days  of  the  effective  date  of  a  personnel  action.   29  C.F.R.  §
1614.105(a).   Ex.  6:301.   Plaintiff  initially  contacted  her  EEO
counselor  on  November  16,  2005;  therefore  the  deadline  for  an
alleged discriminatory action to have occurred was October 2, 2005.
She filed an EEOC charge of discrimination on March 9, 2006 and on
April  5,  2006.   She  filed  a  formal  charge  of  discrimination  on
March 9, 2006, supplemented on April 5, 2006 (#34, Ex. 2), alleging
discrimination  by  management  based  on  race,  sex,  national  origin,
disability,  hostile  work  environment,  and  reprisal  based  on  prior
EEO  activity.   Exs.  2:293  and  6:659.   She  elected  to  a  Final  Agency
Decision,  which  was  issued  in  February  2007.   #34,  Ex.  3.   She
filed the instant lawsuit on May 10, 2007.

Defendant  argues  that  the  first  claim  that  Plaintiff  was
subjected  to  a  hostile  working  environment  "beginning  in  2000"  is

untimely and she fails to provide the dates of occurrence.[34] *See Vidal v. Chertoff*, 293 Fed. Appx. 325, No. 07-40705, 2008 WL 4280320, *5, *3 (5th Cir. 2008)(affirming dismissal of Title VII claim for failure to exhaust administrative remedies because plaintiff did not timely contact the EEO officer; concurring with lower court that even if it had the power to equitably toll the time limits, it should not).

Plaintiff's number 2 claim, that management denied her application in October 2004 for telecommunicating is a discrete act and time-barred, as are numbers 3 (work assignments, including Chevron residency), 4 (transfer), 7 (award delay), 8 (G-14 promotion), 9 (unwelcome remarks in 2000), 10 (engagement letter), and 11 (office too small),[35] because they constitute discrete acts of discrimination and Plaintiff failed to contact an EEO counselor within 45 days of each incident. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory conduct must file his charge within the appropriate time periods . . . .").

Defendant maintains that equitable tolling is applied

---

[34] Defendant also notes that Plaintiff has not provided the dates of occurrences for claims 3, 10, 11 in her complaint.

[35] Defendant notes that Lonnie Kimball testified that events numbered 8 and 9 occurred before he became Plaintiff's supervisor in November 2004 [Ex. 6:664].

sparingly and then only in certain circumstances:  (1) during the pendency of an action before a state court that has subject matter jurisdiction, but that was the wrong forum under state law, (2) until the claimant knows or should know the facts giving rise to her Title VII claim, and (3) when the EEOC misleads the claimant about the nature of her rights.  *Chappell v. Emco Mach. Works Co.*, 601 F.2d 1295, 1302-03 (5th Cir. 1979); *Hood v. Sears Roebuck and Co.*, 168 F.3d 231, 232 (5th Cir. 1999)(evaluating plaintiff's claim of mental incapacity and declining to toll on that basis); *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 880 (5th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004).  Defendant contends that equitable tolling should not be applied here.

Last, Defendant correctly insists that Plaintiff failed to raise claim number 5 (locked door) in her EEO charge, nor was it an accepted issue.  Exs. 1-3.  Therefore it is barred.

## 2.  Failure to Establish a *Prima Facie* Case

Defendant contends that Plaintiff has failed to establish a *prima facie* case of discrimination based on any of her claimed protected groups.  Defendant approaches the issue by alleged events.

Regarding the denial of Plaintiff's two requests to be allowed to telecommute, the first was presented to supervisors Green and Kimball in October 2004, and the other on March 6, 2006, to Moody

and Kimball.[36]   Assuming that the alleged incidents occurred, Defendant states that both fail because Plaintiff cannot demonstrate that an adverse employment action occurred or that others similarly situated were treated more favorably than she was. Furthermore, even if she had stated an actionable claim, Defendant has articulated a legitimate, nondiscriminatory reason for its denial of both telecommuting requests.   Regarding the first request, Plaintiff and three other employees' requests were denied because a new telecommuting agreement would come out at the end of the month and Kimball told the applicants that he would not approve telecommuting until that new form was issued.  #34, Kimball's Dep., Ex. 6:678-86.  He asked the four to resubmit their requests on the new form after October 31, 2004, gave them a copy of the new agreement, and reviewed with them all the new rules and regulations of telecommuting privileges.  *Id.,* and at 719, 738.  Kimball also sent Plaintiff an email stating that she would have to wait until the last day of October and submit a new telecommuting agreement. #34, Ex. 6:678.  Plaintiff failed to file the new agreement (Ex. 6:678-79), while the other employees who did and were approved. #34, Exs. 6:678-86; 5:32-33.  Green also testified that Kimball met with all of the employees and gave them the new updated agreement. Ex. 6:678-79, 739.  She further stated that there were other employees whose initial requests on the old form were denied, but

---

[36] *See* footnote #8 of this Opinion and Order.

they resubmitted those requests on the new form and were approved. Ex. 6:678-79, 739.  *See also* Moody, #34. Ex. 6:677-79, 719; Green, Ex 6:678-79, 739.

On March 6, 2000, Plaintiff filed a reasonable accommodation request, based on her alleged fibromyalgia, that also included a request for telecommuting privileges for four or five days per pay period.  Exs. 6:677-86, 719-20, 721, 738; 5:33.  The guidelines mandate that supervisors, which included Plaintiff, were allowed to telecommute only two days per two-week pay period. Ex. 6:679, 721. Furthermore, Plaintiff did not submit proper or current medical documentation of her alleged disability to the human resources department to substantiate her request for a reasonable accommodation.  Exs. 5:34; 6:678-86.  Moody testified that human resources told Plaintiff within 10 days of her request, and again in April, May, and June of 2006, that they needed updated information from her 1991-92 medical documentation, but Plaintiff responded that she had already brought in all that was necessary. Ex. 6:720-21.  At the end of June 2006, Plaintiff's supervisor, Gary Grant, denied her second request because she failed to submit the requested current medical documentation.  Ex. 6:658, 681, 721. Plaintiff was offered the standard two-day per pay period telecommuting privilege, but she refused it as insufficient.  Ex. 6:721.  Ultimately she submitted a third telecommuting agreement, was granted the standard two-day-per-pay-period privilege in 2008,

and is currently using that.  Exs. 4:27-29; 5:34.

Regarding Plaintiff's complaints about not being given full-time work assignments from 10/04 to 10/05 and being denied the opportunity to work on transportation system, random audits, and the Chevron residency, Defendant contends that Plaintiff fails to demonstrate that she was subjected to an adverse employment action or that other similarly situated employees were treated more favorably than she.  Faye Stewart, allegedly a similarly situated employee to Plaintiff with respect to work assignments, had the same problem and was not treated more favorably.  Plaintiff's conclusory, self-serving statement that she was better qualified for the Chevron residency position than others, without supporting evidence, is insufficient.  Conjecture, speculation, and conclusory allegations do not state a claim for which relief can be granted. *Grines v. Tex. Dep't of Mental Health and Retardation*, 102 F.3d 127, 140 (5th Cir. 1996).

Moreover, Defendant insists it has articulated a legitimate nondiscriminatory reason for its actions.  Kimball testified that when he first came to MMS-CAM in November 2004, work was very slow, there few employees to supervise, he acquired two GS-13 supervisors, Plaintiff and Faye Stewart, concurrently from RIK, and there were too many GS-13s in the office for the overall number of employees in the unit.  #34, Exs. 6:272, 674, 687-90.  Furthermore, he could not hire employees to work under Plaintiff and Stewart

until Michael Casias retired.   After Casias did retire, Kimball readjusted the teams and redistributed the team members, with Plaintiff working under Carol Green and Stewart under Kimball, and subsequently under Linda Moody.   Green testified to the same situation.  #34, Ex. 6:272, 742-444.  Moody also testified to the lack of positions when Plaintiff returned from RIK.  #x. 6:712-13.

As for the modification of Plaintiff's engagement letters, Moody testified that she and Kimball reviewed Plaintiff's work and made modifications, to which Plaintiff objected and stated that a secretary should make the changes.  #34, Ex. 6:715-17.  According to Moody, after making some of the corrections requested, Plaintiff increasingly demanded that Moody's secretary do the work.  Thinking there were too many demands on her secretary, Moody took the letters and made the corrections, including correcting addresses, grammar, style and language, in order to get them out.  *Id.*  Lonnie Kimball, testifying that there "was just minor stuff to be changed" like incorrect lease numbers and excessive use of dashes, explained that they were doing a new kind of audit and it was the first time they sent out engagement letters on it; and that they wanted the right wording and format.  *Id.* at 669-72.  Moody in essence confirmed that changes had to be made because of the new audit.  *Id.* at 714.   Moody further stated that after she became a team manager in July 2005, she and Kimball gave Plaintiff an assignment and team through which Plaintiff could work into a transportation

audit team, as she had wanted, and by October 2005, they assigned her to do transportation system audits and random audits.  #34, Ex. 6:272, 699, 709-10.  Kimball testified that he did not want to assign her to the Chevron residency until he knew what she could handle because she was previously taken out of the Unocal residency because of complaints about her.  #34, Ex. 5:30.  Moody explained that she did not recommend Plaintiff for the Chevron residency because three people who were currently assigned to it asked that Plaintiff not be assigned to it as their supervisor.  #34, Ex. 6:272, 708-09.  In addition, Moody noted, Plaintiff's entire team on her previous audit before she transferred to RIK complained about Plaintiff's supervision.  #34, Ex. 6:272.  Instead Moody recommended Bob Williamson for the Chevron residency because she believed he would work better with the current team and because Plaintiff was too aggressive for it.  #34, 6:272, 712.

With respect to the alleged demotion when Plaintiff was reassigned to RIK from April 18, 2004 through October 3, 2004, assuming the incident is true, Defendant argues that Plaintiff fails to show that she was subjected to an adverse employment action or that other similarly situated employees were treated more favorably. Defendant emphasizes that Plaintiff, herself, requested the reassignment to a position with a different job classification because she was having problems with her supervisor, Michael Casias, and because she wanted to go with her immediate supervisor,

John Russo, who had been moved to RIK.  #34, Exs. 5:49, 6:262, 4:49.  Stacy Leyshon, who was Plaintiff's first-in-line supervisor when she was reassigned to RIK, testified about Plaintiff's requested reassignment, stated that Leyshon sent Plaintiff the job description for the position on February 25, 2004 indicating that it was a GS-13 non-supervisory position, and stated that Plaintiff did not challenge the job description.  #34, Exs. 6:262-63, 615, 616, 617.  Then on June 24, 2004, Plaintiff sent Leyshon an email expressing concerns about the work she was doing and the classification change from (supervisory) auditor 511 to (revenue) specialist 1101.  Leyshon thought Plaintiff was disenchanted with the work, so Leyshon talked to Human Resources' Patrima Subbarao, who contacted Bobby Maxwell, Plaintiff's previous second-in-line supervisor from MMS-CAM. Ex. 6:262-63, 618-20.  Maxwell reassigned Plaintiff to her position as a supervisory auditor on October 3, 2004.  #34, Ex. 6:640.  Plaintiff complained that during Plaintiff's stay in RIK, Plaintiff was rated as a non-supervisory auditor.  #34, 6:62-21.  Subbarao informed Plaintiff that her classification while she worked at RIK would have to be addressed through her current managers, post-reassignment to MMS-CAM, since Leyshon was no longer Plaintiff's supervisor.  #34, Ex. 6:646, 641.

During November 2004, Human Resources received a document indicating that Leyshon had rated Plaintiff as a supervisory auditor rather than an RIK revenue specialist during her tenure in

RIK.  #34, Ex. 6:264, 274, 640-43, 647-48.  Plaintiff started contacting Human Resources to get her status changed to supervisory auditor during her tenure in RIK, but because Plaintiff was back in MMS-CAM, Leyshon also testified that only supervisors Linda Green or Lonnie Kimball from MMS-CAM had the authority to authorize that change.  #34, Ex. 6:264, 644, 647.  Plaintiff objected that she wanted Human Resources to make the change because Kimball and Green had nothing to do with her move to RIK.  #34, Ex. 6:264, 644-45, 647.  Kimball stated he had no involvement in the reassignment of Plaintiff to RIK, which occurred before he became a manager in MMS-CAM.  #34, Ex. 6:264, 661-62.  Kimball also stated that he would not change the records because Plaintiff actually did not hold a supervisory job while in RIK.  #34, Ex. 6:243, 662.

Plaintiff claims that sometime before November 2004 she and two of the employees under her supervision did some continuing education work, for which Plaintiff requested an award.  Exs. 6:687, 734; 4:55.  Plaintiff confirmed that she did receive a spot cash award in December 2005.  Assuming the allegations are true, Defendant argues that Plaintiff fails to show she was subjected to an adverse employment action or provide any evidence to support her contention that other similarly situated employees were treated more favorably or that she was discriminated against in this incident.  Even if she had, Defendant claims it has articulated a legitimate, nondiscriminatory reason for its actions.  Kimball, who

had not yet arrived at Defendant's Houston office when the incident took place, testified that during this period of time, the award system was changed from individual awards given at the time of recognition to awards at the end of the year incorporated into the employee's evaluation. #34, Ex. 6:265, 664, 666-68. He also noted that as a group award, it would have come out of a higher management budget, not his. He pointed out that once the project was completed, a group award that included Plaintiff was made. Green testified that after Plaintiff sent her an email requesting an award for herself and her team, she forwarded it to Kimball. After they discussed the award with the woman supervising the project, Ms Deborah Gibbs Tschudy, Ms. Tschudy said that the whole team would be awarded. Green and Kimball thought the award would be done through Ms. Tschudy. When Plaintiff later complained that she still had not been awarded, Green and Kimball went ahead and gave Plaintiff the award locally because it was near the end of the fiscal year. #34, Ex. 6:734-35. Moody testified that she never received any recommendations about the award and was not aware that it had been made, but stated that awards were recognized on the employee's performance evaluation at the end of the year. #34, Ex. 6:703-05.

Plaintiff also complains of a lack of promotion on an unspecified date to a G-14 classified new job, but that "they stopped" her from competing for it when she received a notice from

personnel in Washington, D.C. that she did not make the best qualified list because she lacked educational requirements. Defendant argues that Plaintiff fails to demonstrate that she was subjected to an adverse employment action or that similarly situated employees were treated more favorably. Defendant asserts that Plaintiff's conclusory, self-serving statement is vague and fails to state a claim upon which relief may be granted. Nor does she establish through competent evidence that she was better qualified for the position, and thus fails to show discriminatory treatment.

Plaintiff complains of unwelcome comments in early 2000 when her supervisor, Michael Casias, said to her in a meeting in front of her team, "do you understand me, read my lips," and "oh, are you sleeping, got to sleep," and "we got problems with the air conditioning and heating at the office, but nobody complains." Assuming the statements were made, Defendant argues that Plaintiff fails to demonstrate an adverse employment action or that others similarly situated were treated more favorably. Such alleged verbal abuse is nothing more than "petty slights" or "minor annoyances" that all employees fact from time to time. *Browning v. Southwest Research Institute*, 288 Fed. Appx. 170, 179, No. 07-50434, 2008 WL 3009894, *8 (5th Cir. Aug. 5, 2008), *citing Burlington N.*, 548 U.S. at 68.

Assuming that Plaintiff's complaints about the alteration of

her engagement letters, barring her from entering a door next to her office, being closely monitored, and providing training to her employees against her recommendation are true, Defendant contends that she fails to demonstrate an adverse employment action or that similarly situated employees were treated more favorably in regard to these matters.   The complained-of conduct again amounts to nothing more than "petty slights" or "minor annoyances" that all employees face from time to time. *Browning*, 288 Fed. Appx. at 179, 2008 WL 3009894 at *8, *citing Burlington N.*, 548 U.S. at 68. Plaintiff's conclusory, self-serving statements are vague and unsupported by evidence and thus fail to state a claim upon which relief can be granted.   Moreover, Defendant maintains that it has articulated a legitimate nondiscriminatory reason for its actions.

Although Defendant does not discuss the door problem, it has submitted Kimball's deposition, in which Kimball responds that the door would not open from the outside and that it took a while until it was fixed "because we were in the process of moving and they said we were going to move and I didn't want to go through the expense of putting up another door lock when there was another door [twenty or thirty yards from the locked one] that she could use. And then when the move didn't take place, then I went ahead and fixed the door."  6:38-39.

Defendant also responds that Plaintiff's complaints that her office was too small to hold meetings with her team and that her

request to move to the bigger office for the Chevron residency was denied do not constitute an adverse employment action, but are only instances of those "petty slights" and "minor annoyances" that all employees occasionally face, contends Defendant.   Moreover, Plaintiff's conclusory self-serving statements are vague and unsupported by evidence.   Furthermore, as Defendant explained, Bob Williamson was assigned to the Chevron residency, so he got the bigger office that housed that residency.   Plaintiff submits no evidence demonstrating that she was denied the office because of discriminatory reasons.

As for her two claims of reprisal for prior EEO activity, on her initial contact with the EEO on November 16, 2005 she complained that her employer was retaliating against her by making her submit current medical documentation to support her second telecommuting agreement as a reasonable accommodation for her disability.   Her second retaliation claim is that after she contacted the EEO, she was stopped from competing for the GS-14 position.

Defendant argues that Plaintiff fails to make a *prima facie* case of retaliation because she fails to show the third element, a causal link between the employer's adverse employment action and the protected activity.   In *Burlington N.*, the Supreme Court rejected the Fifth Circuit's standard of an "ultimate employment decision" to satisfy the "adverse employment action" and instead

-72-

concluded that a plaintiff "must show a reasonable employee would have found the challenged action materially adverse which . . . means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 60. The Fifth Circuit has opined that showing a causal link is "highly fact specific" and that the court may consider (1) the employee's past disciplinary record, (2) whether the employer followed its usual disciplinary procedures when taking adverse action, and (3) the temporal relationship between the protected activity and the adverse action. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507-08 (5th Cir. 1994); *Konnethu v. Harris County Hosp. Dist.*, ____ F. Supp. 2d ___, Civil Action No. H-08-1465, 2009 WL 3615974, *8 (S.D. Oct. 28, Tex. 2009). Close proximity may be a significant factor, but not necessarily determinative of the relationship. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995). Defendant insists that none of its actions was harmful to the point where it would dissuade a reasonable employee from making or supporting a charge of discrimination. Its request for current medical documentation is not materially adverse to a reasonable employer, nor is being "thwarted" from competing for merit promotions because Plaintiff was not qualified for the position. Plaintiff's conclusory allegations are insufficient to demonstrate that an adverse employment action occurred or the existence of a causal link.

Regarding Plaintiff's hostile work environment claim, composed of all the disputed actions alleged by Plaintiff here based on race, national origin, sex, disability and reprisal, Defendant notes that under *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), in determining whether a workplace constitutes a hostile work environment, the Court should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Magnum v. Cato Corp.*, No. 3:06CV701TSL-JCS, 2008 WL 2512376, *5 (5th Cir. 2008)(*citing Harris* for that proposition). *See also Holden v. Illinois Tool Works*, 2008 WL 183334 at *2 ("In examining whether a plaintiff has alleged facts supporting a continuing violation, a court considers the nature of the alleged acts, the frequency of the acts, and whether the acts have a 'degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.'"), *citing Huckaby v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998).   For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   *Harris*, 510 U.S. at 23, *quoting Meritor*

*Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

Assuming Plaintiff's hostile work environment allegations are true, Defendant insists the challenged incidents (1) do not constitute harassment; (2) are not based on the employee's membership in a protected group or on reprisal; and (3) none of the events affected a term, condition or privilege of Plaintiff's employment. Plaintiff's subjective belief that challenged statements are discriminatory harassment is insufficient. *Magnum*,2008 WL 2512376 at *6, *citing Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001). Plaintiff provides no evidence that she was subjected to unwelcome harassment, or that the challenged conduct is based on membership in a protected group, or that Defendant's actions were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. Plaintiff fails to allege any physical threat or humiliation, or that these unrelated occurrences interfered with her work performance. Thus she fails to state a *prima facie* case of hostile work environment. Moreover, she fails to show that the incidents were based on race, national origin, sex, disability, or reprisal.

Finally, Defendant contends that Plaintiff's ADA/Rehabilitation Act claims should be dismissed because she fails to present evidence of disability discrimination, but only makes bare and unsubstantiated allegations of intentional discrimination.

Moody testified that she did not know Plaintiff had any alleged disability.  #34, Ex. 6:725.  Green stated that she did not consider Plaintiff disabled nor see her impaired by any physical condition.  #34, Ex. 6:731-32.  Casias testified that he never knew that she had a physical condition related to myofascial pain syndrome/fibromyalgia.  Ex. 6:587-88.  Kimball stated that he did not know about Plaintiff's fibromyalgia when he came to MMS-CAM in November 2004, was not aware of it until March 2006, when Plaintiff submitted a reasonable accommodation claim, that Kimball could not see any impairment, and Kimball did not consider her disabled.  #34, Ex. 6:655, 657.

### Plaintiff's Response

Plaintiff addresses the alleged adverse employment incidents separately.

1.  Request to telecommunicate

Plaintiff first maintains that Defendants articulated reason for denying her first request in 2004 to telecommunicate (because she used the old form) is mere pretext and that the allegation that Carol Green stated that other people who submitted their requests on new forms did get approval is false.  In an affidavit dated May 20, 2009, Plaintiff contends that Green denies making that statement and states that she received the old telework form from Plaintiff and submitted it to Kimball, but that Kimball never

returned it for Plaintiff to redo.  #35, Ex. 1.[37]

---

[37] The Court notes that Plaintiff is twisting Green's testimony in an effort to create a fact issue for trial.  Green's affidavit says nothing about Green denying making the statement.  The affidavit reads,

> 5.  I approved Felicia Lopez's telework agreement and forwarded it to Lonnie Kimball.
>
> 6.  Lonnie Kimball told me Felicia Lopez completed an old telework form but Lonnie Kimball never returned the telework agreement to me that Felicia Lopez completed so that I could have her prepare a new form like he did for some other employees who completed an old form.

Green's deposition, #34, Ex. 6:738-39, fills in the details of Plaintiff's 2004 request submitted to Green:

> Q.  What do you recall about that request?  What happened to it?
> A.  She submitted a request to me for telecommuting.  It was all filled out and then we had a meeting, which we called an all hands meeting.  Our boss, Lonnie Kimball, had provided to us at that time a new updated telecommuting agreement.  And this was within, I would say, no more than [sic] week of her already submitting one to me.  He gave everybody a new copy of the telecommuting agreement, went over all the new rules and regulations of telecommuting and he asked everyone to submit new updated telecommuting agreement.
>     Well, I don't think Felicia ever submitted a new one.  She was under the impression that she just submitted one so why do I need to go through all this to do a new one.  I think there was some miscommunication in reference to her needing to submit a new one versus not needing to submit a new one since she had already done one.  And I don't think that has ever been resolved to this day.
> Q.  I see.  Was the initial request ever acted on?
> A.  No.  It was not because of the fact that it was not the new form and the new requested documentation.  It was on the old form.  There was a new form that came out and he asked everybody to complete the new form.  I think she did not.
> Q.  So there was a decision by Mr. Kimball that perhaps the initial request of Ms. Lopez to telecommute was

Plaintiff further points to inconsistencies in the administration of the DOI's telecommuting policy: although it stated that she could only telecommute two days per pay period, Plaintiff claims, without supporting evidence, that other individuals, including Linda Moody, Barry Eller, Lonnie Kimball, Cary Grant, and Diane Dundee, were allowed to telecommute without these restrictions.[38] Plaintiff challenges Defendant's claim that she submitted an earlier request to telecommunicate, allegedly the first in October 2004, because she insists no one was telecommuting at that time.[39] She insists that her first request occurred on

_____

denied and that it should be resubmitted after October 31, 2004?  Do you recall that?
A.  At the meeting he asked everybody to complete a new form that wanted to get telecommute.  There was other people who didn't get approved either that resubmitted the form and got approved.  She did not.

[38] During her deposition (at 29-31), Plaintiff testified that Linda Moody, before her promotion to GS-14, Barbara Rothway, Berry Eller, and Carl Worker were allowed to telecommute when they were GS-13s, while Diane Dundee was a GS-14 and Lonnie Kimball was a GS-15.  She further testified that all these people were white and none was Hispanic.

[39] While her bare-bones complaint identifies only the 2005 request, during her deposition Plaintiff discussed two submissions, one around 2004 to Carol Green, but apparently not approved by and never returned by Kimball, and the second in 2005.  See, e.g., #34, Ex. 4 at17-24.

There was two telecommuting requests.  One of them–it was the first one where I requested the same dates as the one they granted to grade 12 and below.  And there was another telecommuting request for reasonable accommodation.  Both of them were denied.  And the reasonable accommodation, they were asking me for the same medical information I originally submitted.

September 2005 to Carol Green, which Green approved but which Kimball subsequently denied.   Plaintiff states that she never received a communication stating that her request was denied because she used the wrong form nor a request that she use the new form.   She reiterates that Carol Green states in her affidavit that Kimball never returned Plaintiff's telework form to her so that Green "could have her prepare a new form like he did for some other employees who completed an old form."   Ex. 1.

2.   Denial of work assignments

For the period from 10/04 to 10/05 Plaintiff complained that she was not provided with supervisory work and was not given the Chevron residency.   Plaintiff, attaching an affidavit from Diana de la Garza, claims that Diana de la Garza would testify that the practice of not assigning members appeared to happen only to minority women.[40]

---

Ex. 4 at 18, ll. 12-18. When questioned about the requested medical documents, she was asked if someone told her that she needed to submit them and she responded "Yes. . . Linda Moody.  She was my [first-line] supervisor at the time." *Id*. at 18, ll. 8-13, 20-21.

[40] What de la Garza's affidavit actually states in relevant part is,

I am aware that Mr. Kimball in the past tried to reclassify the supervisory positions to three female minority supervisors (Ms. Faye Stewart, Ms. Felicia Lopez and Ms. M. Diana de la Garza).  For a period of time Mr. Kimball did not assign team members to Ms. Lopez and me. When my previous team in New Orleans retired, for several months I asked Mr. Kimball if I would be getting a new team, however his response was that he was not sure.

Defendant claimed that Faye Stewart was similarly situated[41] to herself (and also qualified for the position) and that Defendant articulated a legitimate nondiscriminatory reason for its action, namely that work was extremely slow and there were not enough employees for supervision. Plaintiff responds that Faye Stewart will testify that she is similarly situated to Plaintiff, also without supervisory work at the time, and that she was discriminated against in being denied the job. *See* discussion *infra*.

Plaintiff claims the denial of work to her was an adverse employment action because work was available and that work was provided to a member outside of the protected class; specifically, Bob Williamson, a Caucasian male, was assigned to the Chevron residency.[42] Although Kimball claimed this assignment happened before he came, Plaintiff contends that Carol Green was the immediate supervisor and Kimball was the manager personally directing Plaintiff.[43]

―――――――――――

#35, Ex. 3.

[41] Stewart's affidavit indicates that she is a minority African-American, and also a female Supervisory Auditor at MMS-CAM. While Stewart is black and Plaintiff is Hispanic, they are both not Caucasian.

[42] Plaintiff claims, without supporting evidence, that Bob Williamson's cases did not pass peer review and there is no evidence that he had previous experience working at a residency.

[43] During her deposition (at p. 40), Plaintiff testified that after Linda Moody, who had been working on the Chevron residency as

Plaintiff also repeatedly emphasizes that Defendant never produced the purported letter of complaint about Plaintiff that Linda Moody claims she received from Unocal.  Furthermore, Plaintiff points out that she complained of a mold-contaminated environment at the Unocal Residency (Ex. 4), as well as other problems, which resulted in two biological reports evidencing the contamination.  Because the contamination affected her health, she states, she requested that she be moved to the North Belt office. Ex. 3.  She notes that Defendant denied her request for the Chevron residency, in part based on the alleged complaint from Unocal, effective October 2005.[44]  Plaintiff notified Rosa Thomas from the EEO on November 13, 2005.  Therefore, she insists material issues of fact exist about the alleged complaints about her from Unocal[45] and the superior competency of Williamson in obtaining the assignment to the Chevron residency.

3.  Job Classification Change

---

a GS-13, was promoted to be her supervisor at GS-14, Plaintiff, who had residency experience from Unocal, asked Kimball if she could be assigned to the Chevron residency.

[44] If Plaintiff is trying to suggest proximity between her complaint about the mold and the denial of her request for the Chevron residency, the Court observes that Exhibit 3 regarding her mold complaint indicates it was around December 2002, approximately three years earlier.

[45] In her affidavit, Carol Green stated that Linda Moody said several times that Unocal Corporation had complained about Plaintiff and had sent a letter to the previous manager, Mr. Gonzales.  Green asked Moody for a copy of the letter but said Moody could not produce it.  #35, Ex. 1.

When Plaintiff transferred to RIK from MMS-CAM, she claims her job classification was changed from GS-13 supervisory auditor to GS-13 Revenue Specialist, a non-supervisory classification, without notifying her beforehand.   She states this change constituted an adverse employment action and that she was treated differently from other similarly situated persons outside her protected group, specifically Gary Grant, who was also working on RIK but did not experience a change in his classification of supervisory auditor.

4.   Failure to timely award Plaintiff in February 2005

Plaintiff states that the awards and recognitions program in the DOI Human Resources Handbook states, "Achievements should be recognized at the time of the accomplishment," and "Awards should be presented in a way that supports the significance of the recognition."   The failure of management to do so is a direct violation of Human Resources policy that resulted in an adverse action.   Plaintiff points out that in September of the same year, MMS Directors awarded monetary recognitions to several employees for their efforts during Hurricane Katrina.   She maintains that "a genuine issue of fact is raised because an ordinary reasonable person may infer from this disparate treatment that there was discrimination involved" and insists that Defendant has failed to offer a satisfactory explanation as to why the request went ignored for 10 months despite multiple inquiries."

5.   Lack of Promotion

-82-

Plaintiff claims that she filed an application for a GS-14 job announcement MMSW-TL-06-MM103810 (#35, Ex. 6), but initially it was denied allegedly because she lacked the requisite educational requirements.    After she showed that she did have those requirements (#35, Ex. 7) and after she then made the "best qualified" list showing that she had the credentials for the Merit Promotion Certificate of Eligibility, she claims that "the problem was corrected but it left a stigma in the minds of those handling the application."

Plaintiff also calls "a sham" Defendant's claim that she was not being treated differently because Faye Stewart, an African American, was similarly situated (as a female, non-Caucasian minority) and though qualified, was also not selected for the Vacancy MMSW-TL-06-MM103810, a GS-14 position, which was awarded to a Caucasian male, Gary Grant.   Both Plaintiff and Faye Stewart allege that they experienced discrimination in the denial of their applications for this position and in the award of it to a Caucasian male whose talents did not meet the description in the Vacancy Announcement.[46]

---

[46] Faye Stewart testified by affidavit that she and Plaintiff applied for the Vacancy Announcement MMSW-TL-06-MM103810 position, that both Stewart and Plaintiff had the credentials for the requisite Merit Promotion Certificate of Eligibility, and both were interviewed for the job by Kimball.  Ex. 2. Stewart filed a **race** discrimination complaint with the EEOC based on her non-selection. The Administrative Law Judge ("ALJ") concluded that the Agency's actions in denying Stewart the job were based on intentional race discrimination.  *See* Administrative Judge's Bench Decision, Ex. 9.

Lonnie Kimball, who was involved in the drafting of the Vacancy Announcement for the GS-14 position, selected Gary Grant for the job and sent out a written justification (#35, Ex. 8) for his choice. Plaintiff insists this justification was mere pretext. She repeats many of Stewart's factual allegations in Stewart's EEO complaint against Kimball that the ALJ found to be true. See summary in footnote 46. Plaintiff incorrectly claims that the ALJ found that Kimball "discriminated based on race and gender," when Stewart's claim and the Judge's finding of discrimination were based solely on Stewart's race (African American). Plaintiff filed a complaint for non-promotion effective February 27, 2006.

6.  Unwelcome Remarks

Plaintiff maintains that the harassment and verbal abuse began in 2000 and continue today.

7.  Engagement Letters, Non-Use of Door, Closely Monitored, and Overturned Training Requests

Plaintiff argues that a jury should decide whether a reasonable person her allegations constitute an adverse employment action or are "petty slights and "minor annoyances." The locked door forced Plaintiff, suffering from myofascial, fibromyalgia pain to walk a much longer distance. She insists, without evidence, that Defendant was aware of her condition but, rather than

Stewart did not allege sex or national origin discrimination.

providing a reasonable accommodation, Defendant treats her differently than other employees by making her job more difficult. Although Plaintiff earlier asserted that the around the time of filing her First and First Amended complaint (May-September 2007) she was not allowed to use the entrance door next to her server, now she claims that "[t]he door situation lasted from December 2002 until 2008, when Mr. Kimball finally instructed his staff to change the lock."

8.   Small office

Plaintiff states that she requested the larger office assigned to the Chevron residency because it had been empty for a long time and her team could not fit into her small office.   She maintains that no adequate business reason was ever provided for management's denial.   She insists that in the context of everything else, it was one more form of harassment and retaliation against her.

9.   Retaliation for prior EEO activity

Defendant has argued that "[t]o be retaliatory, a complaint must not predate a plaintiff's protected activity."   *Watkins v. Texas Dept. of Crim. Justice*, 269 Fed. Appx. 457, No. 06-20843, 2008n WL 686571, *3 (5th Cir. Mar. 12, 2008); *Fallon v. Potter*, 277 Fed. Appx. 422, No. 07-30522, 2008 WL 1943829, *2 (5th Cir. 2008). Plaintiff vaguely responds that before the official complaint, there are multiple steps to follow, including going to your immediate supervisor and then following the chain of command, and

"[t]his opens the door to several issues of material fact that must be taken to the jury.  Retaliation cannot be masked by a limited definition set by the people doing the retaliation."  Nevertheless Plaintiff does not state when and with whom she talked or what was discussed, if anything, before she filed an official complaint to even begin stating a pre-EEO contact claim.

10.  Hostile Work Environment

Plaintiff contends generally that as a female Hispanic, she has been subjected to severe harassment in the form of verbal abuse, discrimination, and retaliation, that she has been complaining about it since at least 2004, and that several {unnamed) supervisors will testify that the employer knew of the complaints, but chose to dismiss them, so the harassment continues. She has submitted affidavits from Carol Green, Faye Stewart, and Diana de la Garza (#35, Exs. 1-3, but the Court concludes that none of the affidavits alleges facts reflecting a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Stewart*, ___ F.3d at ___, 2009 WL 3366930 at *4.[47]

---

[47]   The statements in the three affidavits may support a discrimination case, but do not demonstrate severe or frequent discriminatory conduct that was physically threatening or more humiliating than an offensive utterance, or conduct that interfered with Plaintiff's work performance.  *Stewart*, ___ F.3d at ___, 2009 WL 3366930 at *6.

11.   ADA

Plaintiff claims that her fibromyalgia is often so painful as to make it nearly impossible for her to make the hour drive from her home in South Houston to the office in North Houston.  She claims to have "provided medical information back since it was diagnosed on 1991."

### Federal Defendant's Reply

Insisting that Plaintiff's summary judgment evidence fails to raise a genuine issue of material fact for trial on any of her allegations, Federal Defendant reiterates that in her response, Plaintiff fails to state a *prima facie* case and/or to show pretext. Defendant maintains that the affidavits from Carol Green, Faye Stewart and Diana de la Garza (Exs. 1-3) fail to raise a genuine issue of material fact in support of any of Plaintiff's allegations.   Exhibit 4 (letter to Michael Casias regarding environmental threats at Unocal) addresses a matter from December 2002 that is not material to her present claims.  Exhibit 5 (Awards and Recognitions Program) is not dated and is also not relevant to any material issue in her present cause of action.  Relating to Plaintiff's non-promotion to the GS-14 position, Exhibits 6 (Supervisory Auditor GS-511-14 Announcement), 7 (Documents showing Plaintiff did not meet educational requirements), and 8 (Justification for selection of Gary Green), relating to incidents on December 27, 2005, January 17, 2006, and February 27, 2006,

respectively, do not demonstrate evidence of discrimination, nor do they raise a genuine issue of material fact, insists Defendant. Finally, Exhibit 9 (ALJ's bench decision) relates to Stewart, not to Plaintiff.  Plaintiff's leap from an ALJ's findings in Stewart's case to Plaintiff's present cause of action is inadequate and conclusory at best, and though admissible, the ALJ's conclusion has no preclusive effect here.  *Chandler v. Roudebush*, 425 U.S. 840, 863 and n.39 (1976).[48]

Regarding Plaintiff's telecommuting complaint, her allegations that others were allowed to "telecommute without restrictions" is conclusory and unsupported by evidence.  Furthermore, she fails to show that the people she names as having such telecommuting agreements (Linda Moody, Barry Eller, Lonnie Kimball, Cary Grant, and Diane Dundee) are employees similarly situated to her.  Where

---

[48] Under the statutory scheme and legislative history," Congress was aware of the fact that federal employees would have the benefit of 'appropriate procedures for impartial adjudication of the complain[t], and yet chose to give employees who had been through those procedures the right to file a de novo 'civil action' equivalent to that enjoyed by private-sector employees." *Chandler*, 425 U.S. at 863.  Prior administrative findings regarding an employment discrimination are admissible as evidence at a federal-sector trial de novo.  *Id.* n.39, *citing* Fed. R. Evid. 803(8)(C).  *See also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 n.21 (11974)("[C]ourts should be ever mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims.  It is the duty of courts to assure the full availability of this forum.").  The Supreme Court in *Chandler* did comment, "[I]t can be expected that, in light of the prior administrative proceedings, many potential issues can be eliminated by stipulation or in the course of pretrial proceedings in the District Court."  425 U.S. at 863 n.39.

only circumstantial evidence is available, plaintiff must show that her situation and that of the non-protected class comparator are "nearly identical." *Perez v. Texas Dept. of Criminal Justice, Institutional Div.*, 395 F.3d 206, 213 (5th Cir. 2004); *Smith v. Wal-Mart Stores (no. 471)*, 891 F.2d at 1180.   Plaintiff must also be similarly situated to her comparator in the eyes of the employer's organization with respect to the employee's position in the organization and her conduct. *Wyvill*, 212 F.3d 304-05.   Plaintiff fails to do so with respect to herself and the employees that Plaintiff identifies as having non-restricted telecommuting privileges.[49]   Last of all, Plaintiff has not demonstrated an

---

[49] Defendant notes that Plaintiff names the same three people that Faye Stewart named in her complaint:  Linda Moody, Barry Eller, and Diane Dundee.  Not only does Plaintiff fail to meet her burden to allege and prove facts showing that these employees are similarly situated to Plaintiff, but Defendant submits the Agency's Response to Stewart's Position Statement (#36, Ex. A), which,

> The Grievant claims inequitable administration of the telework policy; specifically, she alleges that other supervisors have been permitted to telework more than one day per week.  The current MRM telework policy, issued in April 2006, added the provision restricting supervisors to telework one day per week.  The previous MRM telework policy, issued in February 2003 did not contain this restriction.  The Grievant names three supervisors (Linda Moody, Barry Eller, and Diane Dunde) who were allegedly teleworking outside of the policy guidance.  The Grievant alleges that Ms. Moody was allowed to telework more than one day per week while occupying a GS-13 position.  The Agency finds that Ms. Moody left the GS-13 position in July 2005, prior to the implementation of the one day per week policy.  The Grievant alleges that Mr. Eller was allowed to telework more than one day per week but does not specify a timeframe. However, the Agency finds that Mr. Eller's situation involved medical reasons and

adverse employment action with respect to telecommuting.   In any event, Defendant has articulated a nondiscriminatory reason for its denials, and Plaintiff has not shown it is pretextual.

Regarding Plaintiff's non-promotion claim, Defendant insists that her evidence (Exhibits 6, 7, and 8) does not show that she was discriminated against in not getting promoted.   Morever, even if she had established a *prima facie* case, Defendant articulated a legitimate, nondiscriminatory reason for promoting another person. Plaintiff cannot demonstrate pretext or that she was better qualified.   To prove those reasons are pretextual, Plaintiff must submit evidence demonstrating the falsity of each of Defendant's reasons and show that she was "clearly better qualified" than the selected employee.   *Bacas v. Harvey,* 270 Fed. Appx. 329, 331 (5th Cir. 2008)(*citing Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874,

---

worker's compensation issues which continued until his separation from the Agency in December 2006 .

As for Ms. Dundee, the Grievant surmised that Ms. Dundee was "teleworking on almost a full time basis since she came on board with MMS in late 2005" by adding up her absences from the office and inferring that she was teleworking during them.   The Agency explained that Ms. Dundee "was part of a separate organization under a different management.   At first the Agency was told that Ms. Dundee did not participate in the telework program.   Following an investigation, the Agency discovered that Ms. Dundee from November 2005 until approximately February/March 2007 had been participating in the telework program without the proper paperwork in place.   The Agency completed the proper paperwork and approved an exception to allow Ms. Dundee to telework two days per week for business related reasons.   The Agency denied that its application of the telework policy is discriminatory and disparate in nature. I*d.*

882 (5th Cir. 2003)(a showing that an unsuccessful applicant was "clearly better qualified," not merely "more qualified," than the selected applicant satisfies plaintiff's burden to prove that the employer's articulated legitimate reasons for hiring him are pretext), *cert. denied*, 540 U.S. 1107 (2004)), *cert. denied*, 129 S. Ct. 420 (2008); *Mire v. Texas Plumbing Supply Co., Inc.*, 2008 WL 2704573 at *5 (5th Cir. 2008).

Defendant argues that Plaintiff's complaints that she was denied the Chevron residency auditor's larger office and that her employees received training that she did not recommend are not "adverse employment actions" under Title VII. Defendant further points out that Plaintiff has not shown that she was treated differently from other similarly situated employees. If the Court finds that Plaintiff has made a *prima facie* case and Defendant has articulated legitimate, non-discriminatory reasons for its treatment, Plaintiff has failed to show pretext, insists Defendant.

Finally, Defendant contends that none of Plaintiff's other allegations are adverse employment actions, nor can she demonstrate pretext. *King v. Louisiana*, 294 Fed. Appx. 77, No. 07-31069, 2008 WL 4326493, *6 (5th Cir. 2008)("Even taken in a light most favorable to [plaintiff], allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation")(*citing Burlington Northern*, 548 U.S. 53, 68

(2006)), *cert. denied*, 129 S. Ct. 2053 (2009).  *See also Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir.)(holding that criticism, oral threats, abusive remarks and threats of termination did not arise to the level of adverse employment action), *cert. denied*, 531 U.S. 816 (2000).

**Court's Decision**

**1.  Exhaustion of administrative remedies**

The record reflects that Plaintiff contacted her EEO counselor on November 16, 2005.  Thus any alleged discriminatory conduct by Defendant before October 2, 2005 is time barred unless Plaintiff can show a continuing violation, a single practice composed of related acts, as a justification for equitable tolling of the 45-day limitations period.

Although Plaintiff alleges that the hostile work environment began in 2000, the only action the complaint specifically complains of around that time was her then-supervisor Michael Casias' allegedly demeaning comments to her in front of her team:  "Do you understand me, read my lips," and "Oh, are you sleeping, go to sleep."  She did not contact the EEO counsel at that time.  On their face, these remarks are not related to Plaintiff's gender, race, national origin or disability, nor does she submit evidence to prove that they were.  The comments clearly do not constitute an adverse employment action (i.e., ultimate decisions such as hiring, granting leave, discharging, promoting or compensating).  Moreover,

the record shows that Casias, like Plaintiff, was Hispanic, though not from Puerto Rico.  Casias was not her supervisor during her other later charges, and because none of her other specific allegations are similar in nature to this, Plaintiff fails to show that they are part of a single practice of discrimination for a continuing violation of Title VII.  *Stewart*, ___ F.3d at ___, 2009 WL 33366930, at *5, *citing Burlington N.*, 536 U.S. at 120.  Thus her allegations that Casias' remarks were discriminatory are dismissed for failure to exhaust timely administrative remedies. Moreover, the frequent change in Plaintiffs' supervisors who made decisions about her employment before 2004, summarized in footnote 8, also erodes allegations of a hostile work environment.

Plaintiff's transfer to RIK on April 18, 2004 and transfer back to MMS-CAM in early October 2004, even if the first was a "demotion" because of the loss of supervisory status as she alleges, are not adverse employment decisions because, as the record demonstrates, they were effected at Plaintiff's own request. *See* Plaintiff's own Dep., #34, Ex. 4:49; Stacy Leyshon's Dep., #34, Ex. 6:617; and Gregory Smith's Affid., #34, Ex. 6:629.  There are no facts alleged nor evidence submitted suggesting that the transfer was based on Plaintiff's gender, race, national origin, or disability, but solely upon her request.  Moreover Plaintiff's supervisor at RIK, Stacy Leyshon, testified that Leyshon had sent Plaintiff a job description of the position on February 25, 2004,

indicating that the RIK was a GS-13 non-supervisory one; she testified that Plaintiff did not challenge the job description. Ex. 34, Exs. 6:262-615, 616, 617.  Moreover the transfer, even if it were an adverse employment action as Plaintiff claims, was a discrete act that should have alerted her to report it to an EEO counselor within forty-five days.[50]  As discrete acts the transfer and retransfer also cannot be part of a continuing violation based on her later EEO complaint.[51]   Thus her allegations of discrimination based on the transfer are dismissed, *inter alia*, for failure to exhaust administrative remedies.

Other alleged discrete acts that Plaintiff insists are discriminatory adverse employment actions and that occurred before October 2, 2005 and are thus time-barred include her October 2004 request for and denial of a telecommuting agreement, modifications of her engagement letter drafts "sometime after October 3, 2004," her request for a large office also "sometime after October 2004,"), the substantial delay in granting her request for an

_____

[50] Evidence showed that by July 2004 Plaintiff had sent an email to Leyshon expressing discontent and a desire to return to MMS-CAM.

[51] Even if Plaintiff had show that the transfer was an adverse employment decision and that she had properly exhausted administrative remedies, she fails to show a similarly situated employee who received more favorable treatment.  Although she points to Gary Grant, a Caucasian male, as a similarly situated person allowed to keep his supervisory status while working in RIK, she fails to submit any evidence to show that he was "similarly situated"  under the Fifth Circuit's narrow standard.

award,[52] and claims relating to limited work assignments before October 2, 2005.[53]

## 2.  Prima facie case of disparate treatment discrimination under Title VII

Defendant has not disputed that Plaintiff is member of protected groups under Title VII in that she is a Hispanic Puerto-Rican female, and that she was and is qualified for her job.  She continues to work for the Department of the Interior.

At issue for a *prima facie* case of discrimination based on her gender, race, and national origin are whether she was subjected to an "adverse employment action," and whether other similarly situated employees outside her protected classes were treated more favorably.

Only "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensation, qualify as adverse employment actions for a disparate treatment action based on race and/or national origin, and/or gender.  *Washington v. Veneman*, 109 F. Appx. 685, 689 (5th Cir. 2004), *citing Mattern*, 104 F.3d at 818.

_____

[52] The request was made in February 2005, but the award was not given until December 2005.  So there was already an 8-9 month delay before Plaintiff contacted her EEO counselor, enough to cause a reasonable person to file a grievance if she considered it a discriminatory adverse action.

[53] Plaintiff alleges that beginning October 2004 she received few work assignments and that deprivation continued, both discriminatory and in retaliation, after she contacted her EEO counselor.  #34, Ex. 1:280.

Nearly all of Plaintiff's claims, even if taken as true, fail to constitute adverse employment decisions:  denial of telecommuting agreement, denial of use of an entrance door, close monitoring by her supervisor, changes in her drafts of engagement letters, delayed award, assignment to a small office, denial of a larger and better located office, and denial of work requests.  As a matter of law, even being totally denied a performance award is not a ultimate employment decision.  *Hackney v. Texas Department of Criminal Justice*, No. 1:07-CV-113-TH Jury, 2009 WL 2391232, *8(E.D. Tex. Aug. 4, 2009), *citing Washington*, 109 F. Appx. at 689.[54]  Nor is denial of adequate work assignments to fill a nine-hour day an adverse employment action.  *Washington*, 109 Fed. Appx. at 689, *citing Hernandez v. Crawford Bldg. Material*, 321 F.3d 528, 532 n.2 (5th Floor 2003).  Similarly the Fifth Circuit has found that close monitoring of an employee's conversations, criticism of an employee's work and conduct, downsizing an employee's staff as part of an agency-wide reduction, and refusing to consider her input in business decisions do not constitute ultimate employment decisions.  *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir, 1997), *cited for that*

---

[54] In this case Plaintiff was not denied an award, but it was merely delayed.  Even if it were an adverse employment decision, Plaintiff has not shown that Defendants' explanations were pretextual, i.e., that there was some confusion who was to give the award and that the award procedure was changed to have awards at the end of the year in conjunction with performance reviews.  *See, e.g.*, Kimball Affidavit, #34, Ex. 6:667-68; Moody Affidavit, #Ex. 6:703-04.

proposition in *Hernandez,* 321 F.3d  532 n.2; *see also Ellis v. Principi*, 246 Fed. Appx. 867, *3 (5th Cir. 2007)(holding that careful monitoring of job performance and a decision not to grant a discretionary award are not actionable under Title VII). "[N]othing in Title VII or the Supreme Court's decision [in *Burlington Northern*] indicates that moving an employee to a smaller work station is the type of employment condition that Congress intended to be actionable." *McKay v. Johanns*, 265 Fed. Appx. 267, 269 (5th Cir. 2008).  "Even taken in a light most favorable to [plaintiff], allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *King v. Louisiana*, 294 Fed. Appx. 77, No. 07-31069, 2008 WL 4326493, *6 (5th Cir. 2008)*(citing Burlington Northern*, 548 U.S. 53, 68 (2006)), *cert. denied*, 129 S. Ct. 2053 (2009).  The Fifth Circuit has also held that criticism, oral threats, abusive remarks and threats of termination did not rise to the level of adverse employment action. *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir.), *cert. denied*, 531 U.S. 816 (2000). *See also Dollis v. Rubin*, 77 F.3d at 782 (affirming decision that an employer's denial of a "desk audit" to a female employee claiming that the decision restricted her "promotional opportunities" was not actionable under Title VII); *Davis v. Miss. Transp. Comm.*, 618 F. Supp. 2d at 564 ("[W]e have repeatedly held

that an employment action that limits an employee's future opportunities for promotion, but does not affect the employee's job duties, compensation, or benefits, does not qualify as an adverse employment action."), *citing Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003), and *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000), *abrogated on other grounds, Burlington N.*, 548 U.S. 53. The denial of Plaintiff's two requests in October 2004 and in March 6, 2006 (even if the first were not time barred) for telecommuting are also not adverse employment actions for purposes of her Title VII claims of gender and race/national origin discrimination because they are not ultimate employment decisions (hiring, granting leave, discharging, promoting, and compensation).

Moreover, Plaintiff fails to connect any of these challenged employment actions to discrimination based on her gender, national origin/race, or disability.

Even if it were not time-barred, Plaintiff's complaint that her supervisor, Michael Casias, demeaned her during a meeting in front of her team members by saying, "Do you understand me, read my lips" and "Oh, are you sleeping, go to sleep" fail to satisfy the requirements for *prima facie* case. On their face these remarks do not relate to any of Plaintiff's protected classes (national origin/race,[55] gender or disability). Nor are they, in themselves,

---

[55] The record reflects that Casias, himself, was Hispanic.

adverse employment actions.  Moreover, Plaintiff fails to provide the dates when they allegedly were made, essential to determine proximity, nor does she identify any adverse employment action around the time the remarks were made to satisfy the four-prong test of *Brown v. CSC Logic,* 82 F.3d at 655.  "[C]omments that are 'vague and remote in time' are insufficient to establish discrimination." *Id.*, *citing Guthrie v. Tifco Indus.*, 941 F.2d 374 (5th Cir. 1991).  "Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999); *Rubinstein v, Adm'r of Tulane Educ. Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000) (affirming summary judgment against Title VII plaintiff where stray racist remarks had no connection to adverse employment decision), *cert. denied*, 532 U.S. 937 (2001).

Even if not time-barred, as noted, Plaintiff's transfer from MMS-CAM to RIK on April 18, 2004 and transfer back to MMS-CAM with her supervisory status was reinstated only back to October 1, 2004 are not adverse employment actions because they were *at her own request*; she volunteered for the job and requested the return. *See, e.g.*, Leyshon Affidavit, #34, Ex. 6:615-20; Moody's Affidavit, #34, Ex. 6:701  She has not shown that either move was based on her gender, race/national origin, or disability.  Moreover, she was reinstated in her earlier job and has not shown that the six-month

interval between her transfer to a non-supervisory job, if it was a demotion, and her reinstatement to a supervisory position harmed her in any way.  She has not shown that Kimball's refusal to change her status on the record on the grounds that she was not performing a supervisory role while at RIK was pretextual.  Although she also conclusorily asserts that Gary Grant, a white male, was "similarly situated," but was treated more favorably because he did not lose his supervisory status at RIK, she alleges no facts, no less submits evidence, to support her claim under the Fifth Circuit's narrow standard:  she fails to allege facts to demonstrate that they were under the same supervisor or decisionmaker or had their employment status determined by the same person, or that they had the same responsibilities, capabilities, or performed the same job.

There is a timely, exhausted, adverse employment decision alleged by Plaintiff and sufficiently supported by evidence in the record before the Court to raise a genuine issue of material for trial, in her claim of discrimination based on her gender and national origin/race by Lonnie Kimball in the denial of her application for the GS-14 promotion in February 2006.  Denial of a promotion is a material, adverse employment action.  *Dollis*, 77 F.3d at 781-82.

Plaintiff has submitted the ALJ's bench decision on an action by Faye Stewart relating to denial of the GS-14 promotion for which Plaintiff and Stewart both applied and that was ultimately given to

Gary Grant.  While the AlJ's opinion is not binding on this Court in any way and while the ALJ found race discrimination against African American Faye Stewart, based on the same job opening, the ALJ makes factual findings that are relevant to Plaintiff and that, with other evidence in the record support her *prima facie* case of gender and race/national origin discrimination and satisfy her burden to show pretext in Defendant's explanation for its choice of Grant, sufficient to raise a genuine material issue for trial. Moreover such discriminatory intent finds support in prior action, as "background evidence," by Kimball toward Plaintiff.

On a summary judgment review, a court may consider the factual findings and non-final determinations by the EEOC; their contents are "not binding on the trier of fact," but they are admissible as evidence in civil proceedings as probative of a claim of employment discrimination."  *Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998), *citing McClure v. Mexia Ind. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985).  Because under Title VII "civil litigation at the district court level clearly takes on the character of a trial de novo, completely separate from the actions of the EEOC," . . . it is clear that the report is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial."  *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972).  Nevertheless "the district court is obligated to hear evidence of whatever nature which tends to throw factual

light on the controversy and ease its fact-finding burden." *Id.*
In *Smith*, a case of first impression, regarding the facts before
it, the Fifth Circuit observed,

> The Commission's decision contains findings of fact made
> from accounts by different witnesses, subjective comment
> on the credibility of these witnesses, and reaches the
> conclusion that there is reasonable cause to believe that
> a violation of the Civil Rights Act has occurred.
> Certainly these are determinations that are to be made by
> the district court in a de novo proceeding.  We think,
> however, that to ignore the manpower and resources
> expended on the EEOC investigation and the expertise
> acquired by its field investigators in the area of
> discriminatory employment practices would be wasteful and
> unnecessary.

*Id.*  The panel found that the EEOC report, "consisting of a summary
of the charges, a brief review of the facts developed in its
investigation, and its finding of probable cause that violations
exist," was "highly probative of the ultimate issue involved" and
its "probative value, we believe, outweighs any possible prejudice
to defendant" in that discrimination case.  *Id.*  The appellate
court concluded that it constituted a business records exception to
the hearsay rule, admissible under the Federal Business Records
Act, because it was prepared in the regular course of the
Commission's business and in accordance with express statutory
authority.  *Id.* at 157-58, citing 42 U.S.C. § 2000e-5(e).  Such a
report is not prepared in anticipation of litigation because the
Commission is not a party to litigation and has no interest in it,
the investigator who prepared it has no personal involvement in the
situation, and there is no reason to suspect any lack of

trustworthiness or reliability.  *Id.* at 158.  The panel reversed the district court for failing to admit the report into evidence. *Id.*

Moreover, under Federal Rule of Evidence 803(8)(C), which first became effective in 1975, an EEOC determination or factual finding is admissible in a civil action.  *McClure*, 750 F.2d at 399. The current version of Fed. R. Evid. 803(8) provides in relevant part, "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

Subsequently the Fifth Circuit held that a district court erred in refusing to admit an EEOC investigative report and determinations under Fed. R. Evid. 803(6).[56]  *McClure*, 750 F.2d at

---

[56] Currently Rule 803(6) states,

**Records of Regularly Conducted Activity.--**A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other

399 and n.3, *citing inter alia Garcia v. Gloor*, 618 F.2d 264, 272 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113 (1981)(holding it was harmless error because under the facts of that case, the EEOC would not have added appreciable weight to the contention of discrimination), and *Peters v. Jefferson Chemical Company*, 516 F.2d 447, 450 (5th Cir. 1975), *cited by Plummer v. Western Int'l Hotels, Co.*, 656 F.2d 502, 505 (9th Cir. 1981)("[A]n EEOC determination prepared by professional investigators on behalf of an impartial agency, [is] highly probative.").

Admissibility is tempered by Fed. R. of Evidence 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Nevertheless, as the Fifth Circuit held in *Smith*, "'[p]rejudicial' cannot be equated with 'harmful' in all cases; rather it connotes 'harmful' plus 'non-probative.'" *Smith*, 454 F.2d at 157, cited for that proposition in *McClure*.750 F.2d at 400. If, as in *Smith*, "the EEOC determination of employment discrimination is so 'highly probative" of such issue 'that it outweighs any possible prejudice to the defendant' . . . in non-jury cases, we can see no reason why, absent special circumstances, it is not equally so in jury cases." *Id.* Thus the Court considers the ALJ's Bench Decision in

---

        qualified witness, or by certification that complies with
        Rule 901(11), Rule 901(12), or a statute permitting
        certification, unless the source of information or the
        method or circumstances of preparation indicate lack of
        trustworthiness . . . .

Faye Stewart's case where it is relevant here.

With regard to Plaintiff's *prima facie* case of gender and race/national origin discrimination, as noted there is no dispute that (1) she is a member of a protected class (female, non-Caucasian), (2) she was subjected to an adverse employment decision in being denied the CS-14 Supervisory Auditor position, as was the other female, non-Caucasian candidate (Faye Stewart), (3) she was and is qualified for her job and for the GS-14 position (for which she was on the "best qualified" list, and (4) a Caucasian male, Gary Grant, also a GS-13, was treated more favorably.

Lonnie Kimball, a Caucasian male, has been manager of the Offshore CAM division since November 2004. Kimball Affidavit, #34, Ex. 6:653. He was Plaintiff's supervisor and the decision maker for the GS-14 Supervisory Auditor job as well as all the other opportunities she sought after his arrival.

The ALJ's Bench Decision identifies, as the finalists for the job, African American female Faye Stewart, African American male Clifford Coston, Hispanic, non-Caucasian female Felicia Lopez (Plaintiff here), and Caucasian male Gary Grant, all having been determined to have the experience and educational requirements for the job. #35, Ex. 9. Having made a *prima facie* case of discrimination, Plaintiff uses this ALJ's decision to demonstrate that Kimball's articulated, legitimate, nondiscriminatory reason for his choice is pretextual. As reflected in Exhibit 9, *inter*

*alia*, the ALJ pointed out that Kimball stated that he was familiar with the "panel" style of candidate selection, which can provide the perception that the selection process is fair, but that Kimball chose not to use it, and instead, by himself, interviewed each candidate and made the selection.   Although numerous people testified that Kimball took notes during the interview, he claimed that his left hand was in a cast.   Holly-Jean Gilmore stated that she took notes during the interviews to back up Kimball's notes and gave them to Kimball after the interviews were conducted.   Kimball did not produce any notes during the investigation or discovery and testified that the notes were missing.   The Agency's internal regulations require that records relating to a job selection must be maintained for a minimum of two years, and when a complaint has been filed about the action, the records must be maintained for a minimum of two years following resolution of the case.   Kimball even testified that he "figured [he] would probably get an EEO complaint regardless of who [he] selected," but he did not produce any notes on the interviews.

This Court observes that Plaintiff may be entitled to an adverse inference here under the spoliation doctrine.  "Spoliation" is "the destruction of evidence . . . . The significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998)(citations omitted).   "If a party with a duty to preserve

evidence fails to do so and acts with culpability, a court may impose appropriate sanctions. . . . The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007)(and cases quoted and cited therein). "A court may . . . assume facts against a party that destroys or loses evidence subject to a preservation obligation." *Id., citing FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005). Under the doctrine of spoliation, a jury may draw an adverse inference "'that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" *Whit v. Stephens County*, 529 F.3d 278, 284-85 (5th Cir. 2008), *quoting and citing Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 207 (5th Cir. 2007); *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975)("The adverse inference to be drawn from the destruction of records is predicated on bad conduct of the defendant. . . . The circumstances of the act must manifest bad faith."); *in accord, Wal-Mart Sores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003)("a party who has deliberately destroyed evidence is presumed to have done so because the evidence was

unfavorable to its case").[57]

The Vacancy Announcement, drafted by Kimball, listed the GS-14 position's major duties as "planning an overall compliance program; selecting/assigning staff; planning and implementing audits; reviewing work schedules; managing audit teams and coordinating activities of audit teams . . . ." Under a Consent Decree in effect during all relevant times, selecting officials with the Agency were required to prepare and file a written justification for all selections at grades 11 and above where a minority candidate is non-selected from the best qualified list." Kimball was aware of the Consent Decree and the written justification requirement. Kimball prepared a written justification (#35, Ex. 8), which also constitutes Defendant's articulated legitimate, nondiscriminatory reason for the decision, explaining that he had selected Gary Grant "due to his experience as a Supervisory Auditor with MMS; his knowledge of gas plants audits and experience in RIK

_____

[57] Because the alleged spoliation here occurred before any litigation was filed, Fed. R. Civ. P. 37, which is a procedural rule that governs conduct during the pendency of a lawsuit, does not apply here. *Beil v. Lakewood Engineering and Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994).  Although Rule 37 does not apply, the Court may rely on its inherent power to impose sanctions. *Duque v. Werner Enterprises, Inc.*, Civil Action No. L-05-183, 2007 WL 998156, *2 (S.D. Tex. Mar. 30, 2007), *citing Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001)(*citing Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997)); *see also Silvestri v. General Motors, Corp.*, 271 F.3d 583, 590 (4th Cir. 2001(a court's ability to impose sanctions for spoliation is based in the court's inherent power rather than substantive law).

transactions.  Gary has an outstanding work relationship with his employees.  During the interview, Gary demonstrated oral communication and analytical skills that are important for the audit process."  Kimball later testified that he put RIK transactions in the justification because that was work the selectee completed just prior to the interviews.  Kimball also contrarily stated that he was not looking for someone with RIK experience, but for a supervisory auditor.  There was no mention of gas plant audits in the Vacancy Announcement.  Meanwhile Faye Stewart had created and updated the gas plant team and had experience doing gas plant audits and she had RIK transaction experience.  During the interviews Kimball did not ask Stewart, Plaintiff, or Clifford Coston if they had performed gas plant audits or had RIK transaction experience.  Kimball testified that he asked all the candidates the same questions during the interviews for the vacancy.  Furthermore, although the written justification stated that Grant's oral communication and analytical skills were important to his selection, Kimball admitted, "Gary does at times when he explains himself, does get a little nervous any (sic) may stutter.  I took all that into consideration.  I mean, Ms. Stewart's communication skills are excellent.  I gave her that write-up when I was the supervisor for her."  Moreover in a sworn affidavit dated September 12, 2006, Kimball stated, "I wasn't looking for someone particular that was real heavy in

communications skills." Kimball also claimed he could not remember the questions he asked during the interview to test the candidates' analytical skills, and Grant said he could not remember any of the questions Kimball asked him during his interview.[58]

The ALJ, applying the *McDonnell Douglas* framework, found significant evidence of pretext and therefore of intentional discriminatory animus, starting with the key fact that Kimball's justification bears little resemblance to the job description in the announcement of the vacancy. Gas plant audits and RIK transactions were nowhere in the announcement; instead the stated duties were "planning an overall compliance program; selecting/assigning staff; planning and implementing audits; reviewing work schedules; managing audit teams and coordinating activities of audit teams. Kimball did not ask the two minority candidates (Stewart and Plaintiff) about gas plant audits or RIK transactions. The ALJ found that Kimball had required Stewart to work outside of her performance standards and not perform audits; Kimball then informed her that working out of her performance standards was a contributing factor to her lower "fully

---

[58] Though not relevant for Plaintiff here, the ALJ also noted that Stewart had nine more years of supervisory experience than Grant, that she had planned an overall compliance program while employed with DOI while Grant had not, that she had supervised several (4-5) multi-disciplined audits concurrently while Grant had not, and during his tenure Grant had one team consisting of four people. The ALJ found that a comparison of Stewart's qualifications to Grant's demonstrates that "Stewart appears to be a more suitable candidate when reviewing the job description."

satisfactory" performance rating.[59]    Furthermore, Kimball gave inconsistent testimony about note taking and did not produce his or Ms. Gilmore's "back-up" notes during discovery or at the hearing, even though Kimball was the last person in possession of the notes and was aware the requirement that the records be maintained for at least two years.  His testimony about Grant's oral communication skills was also inconsistent.   Moreover Kimball's explanation of his selection of Grant did not comply with the job requirements in the Vacancy Announcement.  These same facts raise genuine issues of material  fact  regarding  pretext  for  Plaintiff's  claim  of  a discriminatory denial of the GS-14 position.

The Fifth Circuit "has repeatedly approved of the introduction of previous conduct to illuminate currently actionable issues in discrimination and harassment cases." *Stewart*,, ___ F.3d at ___, 2009 WL 33366930, at *7, *citing e.g., Cortes v. Maxus Exploration*

---

[59] Kimball also testified that after Plaintiff and Stewart were transferred back to MMS-CAM from RIK, he could not provide the two women with supervisory work because he did not have enough staff to assign to them, and that he had them perform staff duties rather that the proper duties for their position descriptions.  Kimball's Affidavit, #34, Ex. 6:674.  It was from 2004 to 2005 that Plaintiff complains that she was denied work requests and was basically given referencing jobs.  *Id.* at 687-88.  He also stated that he ended up creating and assigning them to teams to work on doing staff duties and  referencing,  rather  than  supervising.    *Id.*  at  688-89. Apparently he saw no disparity in his refusal to allow Plaintiff's classification  during  her  RIK  to  be  retroactively  designated supervisory and his willingness to assign her to work on teams in a non-supervisory capacity but with a supervisory classification during this period.  *See id.* at 689-90 ("I had a period of time that they were not assigned the proper duties that go with their PD.").

*Co.*, 977 F.2d 195, 199 (5th Cir. 1992), *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).   In addition to the GS-14 position, Kimball was also the second-level supervisor who had denied the applications of both Faye Stewart and Plaintiff, both non-Caucasian minority women, for assignment as supervisor to the Chevron residency in October 2005, and instead assigned Caucasian male Bob Williamson to the job.   That incident appears to be within the window for timely exhaustion.   Kimball testified that he did not give her the assignment because she had been taken out of the Unocal residency because of complaints about her.   Carol Green, a supervisor who recommended Plaintiff for the Chevron residency assignment, testified that Moody had stated several times that Unocol Corporation had complained about Lopez and had sent a letter to Mr. Gonzales, the previous manager.   Although Green asked Moody to produce the letter with the accusation, Green could not do so. Ex. 35, 2.1.

     During Lonnie Kimball's deposition (#34, Ex. 5, at 10), when asked, "How many of the Hispanics that are currently in management positions were hired or promoted under you since you've been there?," he responded, "None."

     Relating to her claim of unwelcome remarks, in the briefing Plaintiff pointed to Stewart's affidavit (#35, Ex. 2) testifying to witnessing Kimball offend Lopez in several meetings in front of peers and "direct reports," as well as to Stewart's affidavit (*Id.*,

Ex. 2.1).  Stewart's affidavit states,

> I have witnessed multiple Supervisor meetings
> and training classes where Lonnie Kimball has
> diminished Felicia [*sic*] professional judgment
> and work performed.   At one point we were
> discussing the results of a cumulative report
> compiled by Ms. Lopez pertaining to random
> audits.    The   report   was   being   sent   to
> Congress.   The  results  did  not  like  [*sic*]
> favorably on the agency's performance.  During
> the meeting Lonnie stated he would not let the
> report  to  go  with  Felicia  [*sic*]  findings.
> Many times he has ordered her, in a very rude
> way, to stay quite [*sic*] or that he did not
> want  to  hear  her  comments.   His  behaviors
> toward  her  are  disrespectful.    Dates  are
> available upon request.

In sum, the Court finds that Plaintiff has raised a genuine issue of material fact about Kimball's allegedly discriminatory denial of the GS-14 promotion based on her gender and race/national origin.

## 3.  Hostile work environment

Plaintiff has failed to show a continuing violation because she has not shown that all the separate actions alleged by her are related, so as to constitute a single "practice" for purposes of 42 U.S.C. § 2000e-5(e)(1).  The specific incidents of harassment alleged are not of the same kind, occurred sporadically over a period of years, under various different supervisors.  Only with the arrival of Lonnie Kimball in 2004, who has remained her second level supervisor ever since, has the same person had responsibility for the alleged misconduct toward Plaintiff.

Moreover Plaintiff has failed to show that her workplace was

"permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," whether based on her gender, disability and/or race/national origin *Morgan*, 536 U.S. at 116.  Examining the totality of circumstance to see if any alleged conduct by Defendant was severe and pervasive, the Court observes that from an objective point of view and from the perspective of a reasonable person in Plaintiff's situation, the alleged misconduct, while perhaps subjectively offensive to Plaintiff, was occasional, not severe, and not physically threatening or sufficiently humiliating.  The allegations about Casias' two remarks, denial of telecommuting two different times for legitimate reasons articulated by Defendant and not shown to be pretextual by Plaintiff, denial of use of an entrance door, close monitoring by her supervisor, changes in one or more of her drafts of engagement letters, delay in her team's award, denial of a larger and better located office of the Chevron residency when she had not been assigned to work on it, and denial of work requests, individually or cumulatively were not sufficiently severe or pervasive to affect a term, condition or privilege of her employment. Plaintiff states that other than the one time when she was rated "Fully," a rating that was changed to "superior" once the EEO became involved, she has received top evaluations despite her claims of harassment.  Objectively a

-114-

reasonable person would not find the incidents Plaintiff complains of offensive enough to create a hostile work environment. "Discourtesy, rudeness, teasing, offhand comments, and isolated incidents (unless extremely severe) do not amount to 'discriminatory changes in the terms and conditions of employment.'" *Konnethu v. Harris County Hosp. Dist.*, ____ F. Supp. 2d _____, Civil Action No. H-08-1465, 2009 WL 3615974, *5 (S.D. Oct. 28, Tex. 2009), *citing Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Court finds there has been no showing that the alleged misconduct unreasonably interfered with Plaintiff's workplace performance.

## 4. Retaliation

Plaintiff has met the first prong, participation in a protected activity, when she contacted an EEO counselor on November 16, 2005, filed a complaint on February 27, 2005 with the EEO for denial of the GS-14 promotion and a formal EEOC charge of discrimination on March 9, 2006. "[F]iling an administrative complaint is clearly a protected activity." *Dollis*, 77 F.3d at 781.

The second prong of a *prima facie* claim of retaliation is to show that the employer took an adverse employment action against the employee after prong one. To constitute actionable retaliation, the employment action must be "materially adverse,"

such that it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

Denial of a promotion is an adverse employment action with respect to retaliation under Title VII. *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007). Plaintiff's two specific non-promotion complaints occurred before she contacted the EEO counselor, so the denials could not have been in reprisal. Plaintiff's other complaints (not receiving more work assignments, locked door, supervisor closely monitoring her work, a delay in an award, unwelcome remarks from a supervisor, changes made to her engagement letter drafts, office too small) are not materially adverse, but also occurred before she met with the EEO counselor and fall into the category of "petty slights, minor annoyances, and simple lack of good manners," which were not materially adverse and would not have dissuaded a reasonable employee from making or supporting a charge of discrimination. *Burlington N.*, 548 U.S. at 68. Requiring Plaintiff to submit updated medical information with respect to her second request for telecommuting and request for reasonable accommodation for her alleged disability was necessary under the Rehabilitation Act (as will be discussed) and also in the category of "petty slights, minor annoyances, and simple lack of good manners," which was not materially adverse and would not have dissuaded a reasonable employee from making or supporting a charge

-116-

of discrimination.  *Id.*

Plaintiff's complaint is very vague about what constituted retaliatory action by Defendant; indeed it seems like a repetition of earlier claims without specific facts or dates.  She contends that Defendant took no steps to remedy its illegal activities, that it gave her limited work assignments (no specific examples of what was denied or of anyone else getting more), thwarted her attempts to apply for promotions (not specified), created circumstances that made others not want to work with her or under her, including placement of her office, projects assigned to her teams (no examples), and inequitable treatment of her employees during emergences like Hurricane Rita (no facts provided).  Plaintiff fails to state a claim of retaliation based on such vaguely described claims after her contact with the EEO counselor.

She does assert that Gary Grant gave her the "fully rating" in reprisal on November 16, 2006.  Not only was that rating changed later, thus causing her no significant injury, but the rating was made at least eight months after she filed her complaint.  The Fifth Circuit has determined that a proximity of up to four months may be enough to show a causal link, but not more.[60]

---

[60] *See Cyprow v. Texas Dept. of Public Safety*, Civil Action No. H-07-3045, 2009 WL 1743826, *25 (S.D. Tex. June 17, 2009), in which the court wrote,

"Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie

The final prong of a *prima facie* case of retaliation, a causal connection between the protected activity and the adverse employment, has not been shown with respect to any of the specifically challenged conduct. plaintiff may show a causal link by providing evidence that "the employer's decision to terminate was based in part on knowledge of the employer's protected

---

case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). The Supreme Court has noted that "cases that accept mere temporal proximity as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 . . . (2001). The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link. *See, e.g., Bell v. Bank of America*, 171 Fed. Appx. 442, 444 (5th Cir. 2006)(holding that a seven-month lapse, by itself, did not support establish [*sic*] a causal link); *Riggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002)(holding that a five-month lapse, by itself, does not support an inference of a causal link; *Harvey v. Stringer*, 113 Fed. Appx. 629, 631 (5th Cir. 2004)(finding that a ten-month lapse, by itself, did not create a causal link); *Stroud v. BMC Software, Inc.*, 2008 WL 2325639, at *6 (5th Cir. June 6, 2008)(finding that a three-week lapse between the protected activity and the adverse employment action was sufficient to establish causal link); *Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. 2007)(concluding that two and one half months is a short enough time period to support an inference of a causal link); *Jones v. Robinson Robinson Property Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005)(finding that a period of less than sixty days was sufficiently close to establish causal link for a *prima facie* case of retaliation); *Ware v. CLECO Power LLC,* 90 Fed. Appx. 705, 708 (5th Cir. 2004)(finding a fifteen-day lapse sufficiently close to support an inference of causation); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001)(finding that "a time lapse sufficient to satisfy cause connection for summary judgment purposes")(internal citations omitted).

-118-

activity."  Plaintiff's supervisors following her EEOC charge were Gary Grant and Lonnie Kimball.  She has not presented any evidence that Gary Grant or Lonnie Kimball knew of the EEOC charge, other than the request for disability accommodation in March 2006  #34, Ex. 5 at 15-16; Ex. 6:655.  As noted, she has not provided evidence of sufficient proximity in time either.

## 5.  Rehabilitation Act

Fibromyalgia has been recognized by a number of courts as a chronic disease that can affect the whole body and may be severe enough to become an actionable disability.  *See, e.g., Thornton v. Federal Express Corp.*, 530 F.3d 451 (6th Cir. 2008); *M.P. ex rel. K. and D.P. v. Indep. School Dist. 721*, 439 F.3d 865 (8th Cir. 2006); *Jackson v. City of Chicago*, 414 F.3d 806 (7th Cir. 2005).  "[R]elapsing-remitting conditions like multiple sclerosis, epilepsy, or colitis can constitute ADA disabilities depending on the nature of each individual case."  *Chevron Phillips*, 570 F.3d at 618.  "[W]hether an impairment substantially limits a major life activity . . . is fact specific."  *Id.* at 620.  The Court must consider (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent long-term impact."[61]

---

[61] The Summary of [the EEO] Report, #34, Ex. 6:255-299, states that Plaintiff has symptoms including muscular pain, tender points, spasms, stiffness, sore and aching trigger points, burning, fatigue, sleep disturbance, and headaches; she "indicates that she can go for months without feeling any symptoms."  *Id.* at 257.  She

-119-

Here the lack of any evidence of the status of Plaintiff's disease since 1991-92, the time of the diagnosis, and her refusal to provide updated medical records at the time of her second request for telecommuting defeat her claim.[62]  Moreover, her refusal to submit evidence updating her medical record from her doctor is not only a legitimate articulated nondiscriminatory reason for Defendant's refusal to grant her a telecommuting agreement in 2006, but as a matter of law means she cannot meet her burden of showing she has a disability under the disability discrimination statutes in 2006.  "In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action." *Chevron Phillips*, 570 F.3d at 618.

"Because the ADA requires employers to accommodate the limitations arising from a disability and not the disability itself, an employee seeking to assert a disability discrimination claim must produce evidence that the employer knew not only of the employee's disability, but also of the physical or mental limitations resulting therefrom." *Seaman v. CPSH, Inc.*, 179 F.3d

---

also takes anti-inflammatory medicine, tries to avoid unnecessary stress, which can trigger her symptoms, and physical therapy some times when she has an episode.

[62] Furthermore, as noted by the CDC, "There are difficulties diagnosing fibromyalgia, since its clinical picture can overlap other illnesses and there are no definitive diagnostic tests."  Her failure to provide any medical evaluation since then raises doubt even about the diagnosis.  http://www.cdc.gov/arthritis/basics/fibromyalgia.htm.

297, 300 (5ᵗʰ Cir. 1007; *see also Dortch v. Memorial Herman Healthcare System-Southwest*, 525 F. Supp. 2d 849, 872 (S.D. Tex. 2007)(same).).   Unless the employee's disability has obvious manifestations, an employer cannot be held liable if the employer has not been told of the disability; to impose liability on an employer for failure to accommodate limitations caused by the employee's disability, the employee must request accommodation from the employer and participate in an "interactive" process with the employer to arrive at a suitable accommodation.   *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735-36 (5ᵗʰ Cir. 1999), *cited for that proposition*, *Barcelona v. Bryan Chevrolet, Inc.*, No. 08-4473, 2009 WL 2390812, *2 (E.D. La. July 30, 2009).   *See also Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5ᵗʰ Cir. 1996)("In general . . . it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed. . . . If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.")(quoting 29 C.F.R. § 1630.9 App. (1995)); *Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 866-67 (S.D. Tex. 2008)(*citing Taylor, Seaman, Miles-Hickman, Dortch*).

As discussed, having a diagnosis of fibromyalgia is not enough.  Plaintiff must also establish that she is disabled within the meaning of the statute:   she must present evidence that she suffers from an impairment, or is regarded as having an impairment,

that substantially limits a major lifetime activity.[63]  Plaintiff has not shown that her fibromyalgia limited her in any lifetime activity, prevented her from performing her work duties or other activities, nor does she present any record of such an impairment, despite her alleged frequent pain.  Indeed, the record before the Court indicates that she was able to perform all her job functions without limitation or accommodation for seventeen years before filing suit.  Furthermore, in the record before the Court, everyone in DOI who was asked stated that he or she was unaware that Plaintiff had a fibromyalgia or was in anyway limited in her activities, nor did they from their observation of her think she was disabled, at least until she submitted her reasonable accommodation claim in March 2006.  *See* Casias Dep., #34, Ex. 6:587-88; Leyshon Dep., *id.*, at 613-14; Smith Affid., *id.* at 628; Kimball Affid. 6:655, 657-59; Moody Affid., *id.*, at 725; Green Affid., *id.* at 731-32; Subbarao, *id.* at 637-38.[64]

For these reasons the Court finds that Plaintiff has not met her burden of establishing a *prima facie* case of disability discrimination claim.

---

[63] There is no dispute that she is an otherwise qualified individual.

[64] Pratima Subbarao testified that Plaintiff once sent her an email asking how to enter something into system about a disability she had, but that Plaintiff did not describe her condition but only asked Subbarao a procedural question since Subbarao was her servicing Human Resources specialist.  #34, Ex. 6:637-38.

Accordingly, the Court

ORDERS that Defendant's motion for summary judgment is DENIED as to Plaintiff's claim of gender and race/national origin discrimination based on Kimball's denial of the GS-14 promotion, but is otherwise GRANTED.  The Court further

ORDERS that the joint pretrial order shall be filed no later than April 12, 2010.  Counsel shall appear for docket call on April 23, 2010 in Courtroom 9C at 1:30 p.m. for a trial setting within the following two-week term, beginning April 26, 2010.

**SIGNED** at Houston, Texas, this 14th day of January, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE